# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Lauderdale*, 2012 IL App (1st) 100939

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERNON LAUDERDALE, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-0939 |
| Filed | March 23, 2012 |
| Rehearing denied | May 2, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for attempted first degree murder and his sentence to 31 years' imprisonment, including a 25-year enhancement for personally discharging a firearm that caused great bodily harm to another person, were upheld over his contentions that his counsel was ineffective in failing to ask that defendant be sentenced under section 8-4(c)(1)(E) of the Unified Code of Corrections allowing him to be sentenced for a Class 1 felony, rather than a Class X felony, if he proved he acted under a sudden and intense passion resulting from serious provocation and that the firearm enhancement provision of the attempted murder statute violated the proportionate penalties clause, since defendant's retaliation from the victim's single punch to defendant's jaw was out of proportion to the victim's conduct, especially when defendant shot the victim three times at close range, and the challenge to the firearm enhancement provision for attempted first degree murder has already been rejected by the Illinois Supreme Court. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-14331; the Hon. Joseph M. Claps, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and La Roi Williams, all of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Kalia M. Coleman, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. Presiding Justice Epstein and Justice Howse concurred in the judgment and opinion. |
|---|---|

## OPINION

¶ 1     Following a bench trial, defendant Vernon Lauderdale was found guilty of attempted first degree murder. At sentencing, the trial court imposed a term of 31 years' imprisonment, which included an additional term of 25 years for personally discharging a firearm that proximately caused great bodily harm to another person. Defendant appeals, arguing that he received ineffective assistance of trial counsel because his attorney failed to request the trial court to sentence defendant under section 8-4(c)(1)(E) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/8-4(c)(1)(E) (West 2010)). Section 8-4(c)(1)(E) allows the trial court to sentence a defendant for a Class 1 felony, as opposed to a Class X felony, if at sentencing the defendant proves by a preponderance of the evidence that at the time of attempted murder, the defendant was acting under a sudden and intense passion resulting from serious provocation. Defendant also contends that the firearm enhancement provision of the attempted murder statute violates the proportionate penalties clause of the Illinois Constitution.

¶ 2     Defendant was charged by indictment with two counts of attempted first degree murder, one count of aggravated battery with a firearm, and two counts of unlawful use of a weapon. Prior to trial, the State elected to nol-pros the two counts of unlawful use of a weapon.

¶ 3     Defendant's bench trial began in July 2009, and the following evidence was adduced.

¶ 4     Prentis Smith testified that he was a former member of the Mickey Cobra street gang. He joined in 1978 when he was eight years old and left the gang in 1996. While in the gang, he achieved the rank of a "prince." He identified defendant in court as someone he had known for 20 years. Smith was best friends with defendant's brother. Smith admitted that he was convicted of home invasion in 1998.

¶ 5     On the afternoon of July 20, 2008, Smith testified that he was "on Sedgwick in the Cabrini area." He was in a parking lot with his 16-year-old cousin Deondre Daley and Ryan

-2-

Myles. Daley is also defendant's nephew. During the afternoon, at around 2 or 3 p.m., Smith "had words" with a man called "Shooter." Smith tried to punch Shooter, but missed and Shooter ran. Smith stated that the dispute was over selling drugs in the parking lot. As Shooter left the parking lot, Smith observed Shooter make a phone call, but did not know whom Shooter called.

¶ 6      Later, at approximately 10 p.m. that night, Smith testified that he was in the parking lot with Daley and Myles. Smith and Daley had remained in the parking lot continuously, but Myles had left and returned. He stated that there were "quite a few people in the parking lot." Smith said it was dark outside, but there were lights on two buildings around the parking lot. Smith observed a confrontation between defendant and Daley. Defendant said that it was his parking lot. Smith asked if they moved to Dominick's, was that defendant's too, and defendant responded that it was. Smith stated that defendant pushed Daley to the ground. Smith then punched defendant in the jaw. Smith denied having any weapons on him.

¶ 7      After Smith punched him, defendant reached to his left side and pulled out a dark-colored .32-caliber revolver. Smith testified that he was standing approximately two feet from defendant, that they were "close enough to touch." Smith stated that defendant aimed the gun at Smith's chest and pulled the trigger two times, but the gun did not fire. Smith testified that he said to defendant, "somebody [gave] you a gun with no bullets." Defendant then stepped back and aimed for Smith's left leg and shot him in the left leg. Defendant then shot Smith in the right leg. Defendant aimed the gun at Smith's chest and Smith turned to the side as defendant shot Smith in the shoulder. Smith stated that he "turned to the side to avoid getting shot in [his] heart." Smith estimated that defendant was three feet away from him when the shooting occurred. Smith stated that all three shots were fired in less than five seconds. Smith testified that he stood there in shock. He said defendant "took off running" and "was hollering, 'Cobra crazy.' "

¶ 8      Smith testified that he started to run toward Evergreen, but he blacked out and fell to the ground. He stated that Daley, Myles and Shawn Childs put him in the backseat of Smith's car and took him to the Lincoln Park Hospital. He was later transferred to Illinois Masonic Hospital and treated for three gunshot wounds. He stated that he still has two bullets lodged in his body.

¶ 9      The next day, July 21, 2008, Smith spoke with the police at the hospital and he told them that defendant shot him. Smith was later shown a photo array and he identified defendant in the array. Later, in April 2009, Smith testified that he visited defendant in the Cook County jail with defendant's mother and cousin. Smith stated that defendant apologized and said he did not mean to shoot Smith in the chest and was not trying to kill Smith. According to Smith, defendant said defendant would "take care of me [Smith] if I drop [*sic*] the charges." Smith interpreted this to mean money. Smith had no further contact with defendant.

¶ 10     Detective Marc Leavitt testified that on July 20, 2008, he was assigned to investigate a shooting. He met with Smith at the hospital and Smith told him that defendant was the person who shot him. On July 21, 2008, the detective met with defendant in custody. He advised defendant of his *Miranda* rights and defendant agreed to speak with him and his partner. Detective Leavitt asked defendant if he belonged to a gang and defendant responded

that he used to be a Mickey Cobra.

¶ 11 Chandra Bell testified that on July 20, 2008, at around 9 p.m., she was in the area of 1300 North Sedgwick in Chicago. She was in the area to visit her mother and to look for her two sons. She found her sons in the parking lot on Sedgwick. After she spoke with her sons, Bell talked to Smith for about five minutes. Bell stated that she had known Smith all of her life and had known defendant for 15 years. Bell observed defendant walk up to Smith, but she was unable to hear what they were saying and was not paying attention to them. Bell was walking toward her mother's house when she heard shots fired. She said she ran and saw defendant running 25 to 30 feet away from her with something in his hand, but she was unable to see what it was. Bell also saw Smith being put into a car.

¶ 12 Following Bell's testimony, the State rested. Ryan Myles testified for the defense. Myles admitted that at the time of his testimony, he was in custody for "a drug charge," serving a sentence of four years in the Illinois Department of Corrections. Myles stated that he had known Smith for about two years and Smith is his godmother's cousin. He said he knew defendant the same way. Myles has known Daley his whole life.

¶ 13 On July 20, 2008, Myles testified that he was at 1365 North Hudson, which he estimated is about a block and a half from 1310 North Sedgwick. Myles denied being in the parking lot with Smith that afternoon. He denied seeing an altercation between defendant and Smith. While at the Hudson address, Myles heard gunshots at around 10 p.m. Myles then began running in the direction of the shots. He stated that he went toward the gun shots because he wanted to check on Daley. Myles ran toward Evergreen and Sedgwick. He then saw Smith on the ground. He did not see anyone with Smith. Myles went to get Smith's car and then he saw Daley and Shawn Childs "coming out." They helped Myles put Smith in the car.

¶ 14 The defense then called Kizzy McRay to testify about her knowledge of defendant and Smith as well as her knowledge of the Mickey Cobra gang. The State objected to this line of questioning as McRay was not a member of the gang. The trial court allowed the State to *voir dire* McRay on her qualifications as an expert in Chicago gangs. McRay was allowed to testify.

¶ 15 McRay testified that she is defendant's older sister. She has also known Smith for over 20 years and he is a close friend. Smith was best friends with her deceased older brother, Leon Daley. McRay stated that Leon was a member of the Mickey Cobra gang and he held the rank of "supreme." McRay learned about the gang signs displayed by the Mickey Cobras by being around her brother and his friends. She did not know of "any of [defendant's] involvement in being a Mickey Cobra."

¶ 16 McRay identified various gang signs displayed by Smith in three pictures presented by the defense. McRay testified that Smith was still a member of the Mickey Cobras. McRay then stated that Smith came to her house in June and July 2008 seeking to recruit her son into the gang. McRay admitted that she was not present at the time of the shooting and that she told the investigator from the public defender's office that she did not believe defendant committed the shooting. Following McRay's testimony, the defense rested.

¶ 17 In December 2009, after closing arguments, the trial court found defendant guilty of attempted first degree murder. The court also determined that defendant personally

discharged a firearm that proximately caused great bodily harm to Smith. In January 2010, defendant filed a "motion to reconsider or in the alternative for a new trial," which the trial court denied.

¶ 18 At the February 2010 sentencing hearing, the trial court heard evidence in aggravation, including a victim impact statement from Smith and defendant's prior convictions, one misdemeanor and four felonies. In mitigation, the defense presented the testimony of defendant's mother and noted that defendant worked consistently and had committed no other offenses since 2002. After considering this evidence, the trial court imposed a sentence of 31 years' imprisonment, which included a 25-year enhancement for personally discharging a firearm that proximately caused great bodily harm to Smith. While imposing the sentence, the trial court stated:

"I've considered the factors in aggravation and mitigation. I've considered the arguments of counsel. I've considered the testimony of Mrs. Lauderdale. And I've considered greatly Mr. Vernon Lauderdale's remarks.

Mr. Lauderdale, I truly wish there was a crime called attempt second degree murder. I wish there was. I wish the legislature in this and other cases would have the confidence in the judicial system, in the judiciary, to give freedom to judges to make sentences specific for the crimes committed in consideration with the backgrounds of defendants and the facts of the cases, and the factors in mitigation and aggravation, To me, that would be true fairness.

The legislature has saw fit [*sic*], and I'm not saying or suggesting the legislature is not justified, given the violence that happens each and everyday, to enhance sentences, but there are ways to enhance sentences that would give judges more freedom to carve out sentences that are more representative of the crime and the background of the offender.

From a personal standpoint, I don't believe that what they've done, this particular statute does that, but I am bound by the law. There is nothing I can do. Without the enhancement your sentence would not be the sentence that I am mandated to give you.

I'll also state for the record that given your background and the actions, 6 years would not be the minimum–it's the minimum sentence. That's not what I would sentence you to. But I also wouldn't sentence you to what the minimum is required by law, which is 31 years. But I am obligated to do that. I have no choice but to give you, at a minimum, that sentence."

¶ 19 Defendant filed a motion to reconsider his sentence, which the trial court denied. This appeal followed.

¶ 20 On appeal, defendant argues that his trial counsel was ineffective for failing to argue that defendant was eligible for sentencing under section 8-4(c)(1)(E) of the Criminal Code of 1961 (720 ILCS 5/8-4(c)(1)(E) (West 2010)). Specifically, defendant asserts that, pursuant to section 8-4(c)(1)(E), his trial attorney could have shown by a preponderance of the evidence that defendant was acting under a sudden and intense passion resulting from serious provocation at the time he shot Smith, and the trial court would have sentenced him for a nonenhanced Class 1 felony. The State maintains that defendant's claim of ineffective

assistance of trial counsel lacks merit because defendant would be ineligible for sentencing under section 8-4(c)(1)(E) since the evidence would not support a finding that defendant was acting under a sudden and intense passion resulting from serious provocation.

¶ 21 Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697.

¶ 22 Section 8-4(c)(1)(E), which became effective January 1, 2010, provides:

"[I]f the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony[.]" 720 ILCS 5/8-4(c)(1)(E) (West 2010).

¶ 23 This language is substantially similar to the statutory language for one of the grounds for second degree murder. See 720 ILCS 5/9-2(a)(1) (West 2010) ("at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed"). Since no cases have considered "sudden and intense passion resulting from serious provocation" under section 8-4(c)(1)(E), we turn to cases that have considered serious provocation in reducing first degree murder to second degree murder.

¶ 24 The Criminal Code does not outline what circumstances or categories of serious provocation would reduce first degree to second degree murder. *People v. Sutton*, 353 Ill. App. 3d 487, 491 (2004). However, the Illinois Supreme Court has recognized that "for purposes of reducing first degree murder based on serious provocation, the ' "only categories of serious provocation which have been recognized are: 'substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property.' [Citation.]" ' " *Sutton*, 353 Ill. App. 3d at 491 (quoting *People v. Chevalier*, 131 Ill. 2d 66, 71 (1989), quoting *People v. Crews*, 38 Ill. 2d 331, 335 (1967)).

¶ 25 Here, there was no evidence at trial that defendant suffered a "substantial physical injury or assault" as a result of one punch to the jaw by Smith nor has defendant raised this basis on appeal. Instead, the parties focus on the mutual combat category of serious provocation.

¶ 26 "Mutual combat is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *People v. Austin*, 133 Ill. 2d 118, 125 (1989). "In considering whether defendants have met the threshold burden of proving some evidence of mutual combat, it has been held that the alleged provocation on the part of the victim must cause the same passionate state of mind in an ordinary person under the same circumstances. A slight provocation is not enough, because the provocation must be proportionate to the manner in which the accused retaliated. The crime is murder when a defendant attacks a victim with violence out of all proportion to the provocation." *Austin*, 133 Ill. 2d at 126-27. "There is no mutual combat where the manner in which the accused retaliates is out of all proportion to the provocation, particularly where homicide is committed with a deadly weapon." *Sutton*, 353 Ill. App. 3d at 496.

¶ 27 Defendant argues that the evidence supports his assertion that his attorney could have shown by a preponderance of the evidence that defendant was acting under a sudden and intense passion resulting from serious provocation when he shot Smith. Defendant notes Smith's rank in the Mickey Cobras and the altercation with "Shooter" earlier in the day as support for defendant's actions. However, there was no evidence that defendant had any knowledge of Smith's interaction with "Shooter." Defendant also argues that physically, Smith was much larger than defendant. Defendant bases this argument on Smith's testimony describing defendant as approximately 5 feet 7 inches and weighing approximately 135 to 140 pounds while Smith described himself as 6 feet 1 inch and 230 pounds. However, defendant's arrest report, which is included in the record, states that defendant was 5 feet 9 inches and weighed 265 pounds. Defendant has not argued mutual combat, but instead his argument is more in line with second degree murder that is not included in section 8-4(c)(1)(E), an unreasonable belief that the defendant believes the circumstances to be such that, if they existed, would justify or exonerate the killing. See 720 ILCS 5/9-2(a)(2) (West 2010). Section 8-4(c)(1)(E) does not provide for a mitigated sentence based on unreasonable belief. See 720 ILCS 5/8-4(c)(1)(E) (West 2010).

¶ 28 The record refutes defendant's claim of serious provocation. The evidence presented at trial showed that defendant approached Smith and Daley. Defendant pushed Daley to the ground and then Smith punched defendant in the jaw. In retaliation, defendant pulled out a gun and fired it at Smith five times. The gun did not fire the first two times defendant pulled the trigger. Smith asked defendant if someone gave him a gun with no bullets. Defendant then aimed the gun at Smith's left leg and this time the gun fired. Defendant next shot Smith in the right leg. Defendant raised the gun and aimed at Smith's chest. Smith turned to avoid being struck in the heart and was shot in the left shoulder. Defendant then fled the scene.

¶ 29 There was no mutual combat as the fight was not on equal terms. The evidence showed that only defendant was armed with a deadly weapon. Smith punched defendant one time. Defendant's response of pulling out a gun and firing it multiple times, striking Smith three times, was "out of all proportion" to Smith's provocation.

¶ 30    In *Austin*, the defendant boarded a Chicago Transit Authority bus and got into a dispute with the bus driver over the fare. The evidence at trial was unclear if the dispute was because defendant tried to use a discounted student pass on a holiday or if the defendant sought to take a bus transfer without sufficient payment. Regardless, the defendant got into a physical fight with the bus driver. The two women exchanged blows for about 30 to 40 seconds. The defendant pulled a gun from her waistband and fired it into the floor of the bus. The bus driver was able to force the defendant off the bus, but while both were off the bus, the defendant shot and killed the bus driver. The defendant fled, but later returned to retrieve her bag from the bus and fled again. The defendant testified that she did not intend to shoot the bus driver. *Austin*, 133 Ill. 2d at 122-23.

¶ 31    The supreme court declined to find evidence of mutual combat because the bus driver did not enter the fight willingly and the fight was not on equal terms. *Austin*, 133 Ill. 2d at 125.

"The record in this case indicates that defendant shot and killed an unarmed victim who provoked defendant by speaking gruffly to her and striking her on the hand with a transfer punch. At the most, the victim provoked defendant by engaging in a 'fairly even' fistfight for 30 to 40 seconds and forcing her off the bus. Defendant testified that she was afraid and wanted to cease the altercation with the bus driver. There is nothing in the record, however, to objectively indicate that defendant had reason to fear for her life. Shooting the driver was an act completely out of proportion to the provocation. Therefore, mutual combat cannot apply." *Austin*, 133 Ill. 2d at 127.

¶ 32    In *Sutton*, the defendant contended on appeal that his trial counsel was ineffective for failing to request an instruction on second degree murder based on mutual combat. In that case, the defendant and the victim had been in a romantic relationship. The defendant went to see the victim at her mother's house and they began to argue. During the argument, the victim told the defendant that he was not the father of her son. The victim picked up a roller skate and the defendant picked up a knife. In a statement, the defendant stated that he knew the victim would not hit him with the skate, but at trial, he testified that she hit him with the skate. The defendant then stabbed the victim in the side. They continued to struggle as they moved to the bedroom, where the defendant continued to stab the victim. *Sutton*, 353 Ill. App. 3d at 489.

¶ 33    The reviewing court found that the record did not support the defendant's argument that his attorney should have requested a mutual combat instruction. The contact between the defendant and the victim was not on equal terms and the defendant's response was out of all proportion. *Sutton*, 353 Ill. App. 3d at 496.

"Defendant responded to allegedly being hit by the victim with a roller skate by stabbing the victim 23 times, and 9 of those stab wounds were to her back. The record reflects that the manner in which the defendant retaliated was completely out of all proportion to the words and contact made by the victim. Defendant admitted on cross-examination that he knew the victim would not kill him or put him in the hospital by striking him with the roller skate. If defendant and victim had mutually engaged in combat, defendant retaliated out of all proportion to the victim's conduct, negating a mutual combat instruction." *Sutton*, 353 Ill. App. 3d at 496.

¶ 34    In the instant case, the manner in which defendant retaliated from a single punch to the jaw was completely out of all proportion to Smith's conduct and belies defendant's argument that he acted out of serious and intense passion from serious provocation. There was no mutual combat between defendant and Smith when Smith struck defendant once and defendant responded by pulling out a firearm and shooting Smith multiple times. The evidence does not support a finding that defendant acted under a sudden and intense passion resulting from serious provocation. Thus, section 8-4(c)(1)(E) was not applicable to defendant's conduct. Since defendant could not have been sentenced under section 8-4(c)(1)(E), defendant cannot show how he was prejudiced by his attorney's decision not to argue for its application. While the trial court's comments at sentencing indicate a desire for more discretion in the sentence to be imposed on defendant, the evidence at trial does not support a finding that defendant acted "under a sudden and intense passion resulting from serious provocation." Defendant cannot show that a reasonable probability exists that the result of the proceeding would have been different had counsel referenced section 8-4(c)(1)(E) because this section does not apply under the facts of this case. Accordingly, we conclude that defendant's trial counsel was not ineffective.

¶ 35    Defendant further contends that his trial counsel's "concession" that defendant was subject to the 25-year firearm enhancement provision was objectively unreasonable. However, defendant makes no argument as to section 8-4(c)(1)(D), which provides for an additional term of 25 years to life when the defendant personally discharged a firearm that caused great bodily harm during an attempt to commit first degree murder. 720 ILCS 5/8-4(c)(1)(D) (West 2010). Rather, defendant's argument solely related to section 8-4(c)(1)(E) by arguing that the 25-year enhancement is inapplicable under that section. Since we have already determined that defendant could not have been sentenced under section 8-4(c)(1)(E), we need not consider this argument.

¶ 36    Finally, defendant argues that the firearm sentence enhancement provision, section 8-4(c)(1)(D), is unconstitutionally disproportionate as applied to him. Defendant received the minimum sentence possible for attempted first degree murder, a Class X felony, subject to the firearm sentence enhancement, a 6-year sentence plus the 25-year enhancement. 730 ILCS 5/5-4.5-25(a) (West 2010) (Class X felony has a sentencing range of 6 to 30 years); 720 ILCS 5/8-4(c)(1)(D) (West 2010). Specifically, defendant contends that the minimum sentence of 31 years that was imposed in this case is disproportionate because if he had killed Smith, and it was determined that he acted under a sudden and intense passion resulting from a serious provocation, then the maximum sentence he could have received was 20 years. See 730 ILCS 5/5-4.5-30(a) (West 2010) (second degree murder is a Class 1 felony with a sentencing range of not less than 4 years and not more than 20 years). Defendant contends that his sentence with the firearm enhancement is so wholly disproportionate to the offense committed as to shock the moral sense of the community because it failed to account for mitigating circumstances. See Ill. Const. 1970, art. I, § 11; *People v. Miller*, 202 Ill. 2d 328, 339 (2002).

¶ 37    The State initially responds that defendant lacks standing to raise this claim because defendant was convicted of attempted first degree murder, not second degree murder. "The general rule is that courts will not consider the validity of a statutory provision unless the

person challenging the provision is directly affected by it or the unconstitutional feature is so pervasive as to render the entire statute invalid." *People v. Morgan*, 203 Ill. 2d 470, 482 (2003). "In either case, a party has standing to bring a constitutional challenge only if the party is able to show himself to be within the class aggrieved by the alleged unconstitutionality." *Morgan*, 203 Ill. 2d at 482. Defendant has challenged the constitutionality of section 8-4(c)(1)(D) as violating the proportionate penalties clause of the constitution. Defendant did receive an additional term of 25 years pursuant to section 8-4(c)(1)(D), and therefore, he is within the aggrieved class to challenge the statute and does not lack standing.

¶ 38 We review the constitutionality of a statute as a matter of law, subject to *de novo* review. *People v. Sharpe*, 216 Ill. 2d 481, 486-87 (2005). All statutes carry a strong presumption of constitutionality, and to overcome this presumption, the party challenging the statute must clearly establish that the statute violates the constitution. *Sharpe*, 216 Ill. 2d at 487. "We generally defer to the legislature in the sentencing arena because the legislature is institutionally better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *Sharpe*, 216 Ill. 2d at 487. "The legislature's discretion in setting criminal penalties is broad, and courts generally decline to overrule legislative determinations in this area unless the challenged penalty is clearly in excess of the general constitutional limitations on this authority." *Sharpe*, 216 Ill. 2d at 487.

¶ 39 The proportionate penalties clause of the Illinois Constitution declares that "[a]ll penalties shall be determined *** according to the seriousness of the offense." Ill. Const. 1970, art. I, § 11. In *Sharpe*, the Illinois Supreme Court held that a defendant may raise two types of proportionate penalties challenges: (1) a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community; or (2) the proportionate penalties clause is violated where offenses with identical elements are given different sentences. *Sharpe*, 216 Ill. 2d at 521.

¶ 40 In the present case, defendant is challenging section 8-4(c)(1)(D) under the first type of challenge, that his sentence for attempted first degree murder with the 25-year firearm enhancement is so wholly disproportionate as to shock the moral sense of the community because the enhancement applies even when mitigating circumstances are present, such that the penalty for the attempt exceeds the sentencing range for the actual offense. Defendant asserts that his sentence shocks the moral sense of the community because his 31-year sentence for attempted first degree murder is more severe than the sentence of 20 years he would have received for second degree murder if he had killed Smith. However, the flaw in defendant's argument is that the offense attempted was first degree murder, not second degree murder. As we have already concluded, no mitigating circumstances were present because the evidence in this case does not support a finding that defendant acted under a sudden and intense passion resulting from serious provocation. If defendant had killed Smith, defendant would have been charged with first degree murder. Accordingly, defendant's argument fails.

¶ 41 Further, the supreme court has already concluded that firearm enhancement provisions for attempted first degree murder do not shock the moral sense of the community. *Morgan*,

203 Ill. 2d at 488. The *Morgan* court found:

> "We further acknowledge that the legislative purpose for enacting Public Act 91-404 [the act codifying section 8-4(c)(1)(D)] is the deterrence of the use of firearms in the commission of offenses. The presence of firearms during the commission of an offense always poses an extreme danger, not only to intended victims, but also to innocent bystanders. Thus, we will not second-guess the legislature's determination that the protection of society necessitates the imposition of severe penalties whenever a firearm is used in the course of an offense. [Citation.] Thus, we cannot say that, where mitigating circumstances are not present, it would be cruel, degrading or so wholly disproportionate to the offense committed to subject a defendant who commits the offense of attempted first degree murder to mandatory add-on sentences of 15 years, 20 years or 25 years to life, depending on whether a firearm is present, discharged or the cause of bodily injury. Nor would the imposition of these penalties run counter to the general sentencing directive that 'the penalty for committing an attempt may not exceed the maximum penalty for the offense attempted.' The penalty for first degree murder is a term of imprisonment between 20 and 60 years (730 ILCS 5/5-8-1(a)(1)(a) (West 2000)), which must be enhanced by the addition of 15 years, 20 years, or 25 years to life, depending on whether the defendant, in committing the offense, was in the possession of a firearm, discharged a firearm, or caused bodily injury or death as a result of the use of a firearm (730 ILCS 5/5-8-1(a)(1)(d) (West 2000)). We conclude, then, that the mandatory enhanced sentencing scheme added to the offense of attempted first degree murder does not make the penalty for committing an attempt exceed the maximum penalty for the offense attempted and, therefore, the penalty is not inherently unconstitutional." *Morgan*, 203 Ill. 2d at 488-89.

¶ 42 The supreme court in *Sharpe* overruled part of the decision in *Morgan* which had considered the firearm enhancement provisions under the cross-comparison analysis for proportionate penalties. *Sharpe*, 216 Ill. 2d at 519. While the *Sharpe* court abolished the cross-comparison analysis used in *Morgan*, later in the opinion, the court recognized that it had "already held in *Morgan* that it is neither cruel nor degrading, nor would it shock the moral sense of the community, to apply the 15/20/25-to-life enhancements to attempted first degree murder." (Emphasis omitted.) *Sharpe*, 216 Ill. 2d at 524. The *Sharpe* court, in considering the firearm enhancements for first degree murder, then concluded that "it would not shock the conscience of the community to learn that the legislature has determined that an additional penalty ought to be imposed when murder is committed with a weapon that not only enhances the perpetrator's ability to kill the intended victim, but also increases the risk that grievous harm or death will be inflicted upon bystanders." *Sharpe*, 216 Ill. 2d at 525. Since the supreme court has already rejected the proportionate penalties challenge to the firearm enhancement provisions for attempted first degree murder raised by defendant, defendant's constitutional challenge must fail.

¶ 43 Based on the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 44 Affirmed.