**2024 IL 129795**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 129795)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
VICTOR HAYNES, Appellee.

*Opinion filed November 21, 2024.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Holder White, Cunningham, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Victor Haynes was convicted of attempted first degree murder and sentenced to 31 years' imprisonment. On appeal, defendant argued that his counsel was ineffective for not seeking a reduced sentence under section 8-4(c)(1)(E) (720 ILCS 5/8-4(c)(1)(E) (West 2016)). That section allows a defendant convicted of attempted first degree murder to be sentenced for a Class 1

felony, instead of a Class X felony, if the defendant proves by a preponderance of the evidence at sentencing that "he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death." *Id.* A divided panel of the appellate court affirmed defendant's conviction but vacated his sentence and remanded for resentencing. For the reasons that follow, we reverse the judgment of the appellate court.

¶ 2                                    I. BACKGROUND

¶ 3                                A. Trial Court Proceedings

¶ 4        Defendant was charged with multiple counts of attempted murder (*id.* §§ 8-4(a), 9-1(a)(1)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and firearm possession charges (*id.* §§ 24-1.1(a), 24-1.6(a)(1), (2)). Defendant elected to have a bench trial.

¶ 5        According to the evidence presented at trial, on December 17, 2016, Virgetta White (Virgetta); her uncle, Jerome White (White); and her cousin, James Williams,[1] rented a party bus to celebrate the birthdays of Virgetta and another relative. They invited about 24 close friends and family members. Beginning at 9 p.m., the party bus made a few stops to pick up guests. There was alcohol on the bus but no food.

¶ 6        "JK," whom Virgetta had previously dated, was a guest, as was JK's cousin, James Staples. They asked if defendant could join the party, and Virgetta agreed. The bus made various stops to buy more liquor and for bathroom breaks. At one of the stops, Virgetta exited the bus and threw up. During that time, an argument arose between defendant and two other people. Virgetta told defendant that he could get off the bus if it was "going to be a problem." JK said, "It's cool, I got this."

¶ 7        About 45 minutes to an hour later, defendant and JK started arguing. Virgetta got between them and said, "Let's not do this. This is my birthday." According to

---

[1]Virgetta testified that her cousin was also known as Nathall Williams and by the nickname J-Lo.

a detective, Virgetta said that at this point she shoved defendant two or three times, knocking him backwards; at trial, Virgetta denied doing so. Virgetta testified that defendant punched her in the jaw, grabbed her by the neck, and began choking her.

¶ 8        White saw what was happening and ran three or four steps from the front of the bus toward the back of the bus. He moved Virgetta aside and punched defendant in the face. White was about 6 feet tall and a little more than 300 pounds, and he estimated that defendant was 5 feet, 9 inches or 5 feet, 10 inches tall. Defendant grabbed White's shirt and pulled him, and they fell onto the seats, with White on top. White continued hitting defendant with his fist, for a total of six to seven punches. White was "buzzed" and thought that defendant was probably hitting him, too, but White did not feel any strikes. He then smelled gunpowder and realized that he had been shot in the chest. White fell backwards. About one minute had elapsed since White had first hit defendant.

¶ 9        Williams and defendant then began "tussling," and White saw them fighting over something black in defendant's hand. Two more shots were fired, about four seconds apart and about two to three minutes after the first gunshot. Williams fell. Defendant and Staples pushed through the crowd, climbing over people, and ran off the bus. Defendant held a black gun in his hand, and Virgetta testified that he appeared uninjured.

¶ 10       Shortly afterwards, officers saw defendant and Staples walking down the street. The police later located them in the foyer of a residential building, where officers recovered a small, black, semiautomatic gun from underneath a bench. Defendant had a gunshot wound to his left hand.

¶ 11       Subsequent testing showed that two fired cartridge casings recovered from the party bus had been fired from the gun that the police recovered. The gun still contained two unfired cartridges. As a result of the shooting, White was hospitalized for about one week and underwent multiple surgeries. A bullet remained lodged under his heart. Williams was on life support in a vegetative state.

¶ 12       During closing argument, the State argued that defendant was the initial aggressor. Defense counsel responded that the issue was irrelevant because he was not arguing self-defense but rather that the gun fired accidentally.

¶ 13 The Cook County circuit court found defendant not guilty of the charges related to Williams on the basis that Williams and defendant were struggling over the gun when the gun went off. Therefore, the trial court could not find beyond a reasonable doubt that defendant fired the weapon knowingly or did so with the intent to kill. However, the trial court found defendant guilty of the attempted murder of White. The trial court stated that there was no evidence that any hands other than defendant's were on the gun when White was shot. It stated that defendant was the aggressor, knowingly discharged a firearm, and caused great bodily harm to White. The trial court also found defendant guilty of related charges that merged into the attempted murder conviction.

¶ 14 Defendant filed a motion for a new trial. At the beginning of the hearing, the trial court clarified its findings. It stated that defendant boarded the bus with a deadly weapon that he could not legally carry, pulled it out during the fistfight with White, and shot White in the chest. Based on the gunshot wound's location and the surrounding circumstances, defendant shot with the intent to kill White, rather than injure him, and then fled the scene, which was also an indicium of guilt.

¶ 15 In arguing the motion for the new trial, defense counsel repeated that he had not argued self-defense because that would require that defendant acted knowingly, whereas the gun accidentally fired during a struggle. The trial court denied the motion.

¶ 16 During the sentencing portion of the hearing, defendant made a statement in allocution that he was knocked unconscious. The trial court asked if defendant was saying that the gun went off when defendant was unconscious, and he answered in the affirmative. The trial court found the statement to be "ridiculous" but later stated that it would not consider defendant's assertion and his lack of remorse. The trial court sentenced defendant to the statutory minimum of 31 years' imprisonment, which included a mandatory 25-year firearm enhancement.

¶ 17                            B. Appellate Court Decision

¶ 18 On appeal, defendant argued, among other things, that his counsel was ineffective for failing to seek a reduced sentence under section 8-4(c)(1)(E). The appellate court agreed with defendant. The court stated that, under the statute, a

defendant must show both (1) serious provocation and (2) negligence or accident. 2023 IL App (1st) 220296, ¶ 29. It stated that some prior cases had interpreted the term "serious provocation" in the attempt statute as having the same meaning as "serious provocation" in the second degree murder statute. *Id.* ¶ 35. The court stated that there were four distinct categories of serious provocation and that the categories of substantial physical injury and mutual combat were present here. *Id.* ¶¶ 37, 49. In contrast to *People v. Lauderdale*, 2012 IL App (1st) 100939, it concluded that disproportionality was not a bar to applying section 8-4(c)(1)(E), because "once a party is found guilty of attempt—and, thus, of having the specific intent to kill—disproportionality has essentially already been decided." 2023 IL App (1st) 220296, ¶ 41. The court held that there was a reasonable probability that the trial court could have found that defendant was acting under serious provocation because White ran to defendant to engage in mutual combat with him. *Id.* ¶ 47.

¶ 19        The appellate court further stated that section 8-4(c)(1)(E) also required that the defendant prove that, had the individual he tried to kill died, the defendant would have negligently or accidentally caused that death. *Id.* ¶ 45. It reasoned that, in light of an already proven intent to kill, the only reasonable interpretation of this requirement was that, although the defendant intended to kill the victim, his acts were sufficiently minimal that, had the victim died, the death could still be considered negligently or accidentally caused. Here, defendant had shown a reasonable possibility of success regarding this requirement because he fired one shot at White during a physical altercation. *Id.* The court held that counsel was therefore ineffective for not seeking a Class 1 sentence. *Id.* ¶¶ 47-48. It vacated defendant's sentence and remanded for a new sentencing hearing at which defendant could request a reduced sentence under section 8-4(c)(1)(E). *Id.* ¶ 48.

¶ 20        Justice Tailor dissented on this issue. He stated that defendant had not shown prejudice because he failed to argue that, had White died, his death would have been negligent or accidental. *Id.* ¶ 59 (Tailor, J., concurring in part and dissenting in part). Justice Tailor also argued that defense counsel's performance was not deficient because counsel made a strategic decision to disclaim self-defense based on provocation, in order to instead argue accident. *Id.* ¶ 61. Further, because the trial court had already found that defendant's actions toward White were not accidental, it would have been illogical for defense counsel to pursue this argument. *Id.* Last, Justice Tailor noted that, at sentencing, defendant claimed that he was

unconscious when the gun went off, such that he was not " 'acting' " at all, much less as the result of serious provocation. *Id.* ¶ 63.

¶ 21 We subsequently allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 22                                        II. ANALYSIS

¶ 23 At issue is whether defense counsel provided ineffective assistance for not seeking a reduced sentence under section 8-4(c)(1)(E). To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first show that, despite the strong presumption that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, such that he or she was not functioning as the counsel guaranteed by the sixth amendment (U.S. Const., amend. VI). *People v. Webb*, 2023 IL 128957, ¶¶ 21-22. Second, the defendant must establish prejudice by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *Id.* ¶ 21. A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Gayden*, 2020 IL 123505, ¶ 27. Whether a defendant received ineffective assistance of counsel is a question of law that we review *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 24 Section 8-4(c)(1)(E) provides:

"the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that

* * *

(E) if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the

attempted murder is the sentence for a Class 1 felony." 720 ILCS 5/8-4(c)(1)(E) (West 2016).

The construction of a statute is a question of law that we also review *de novo*. *People v. Fair*, 2024 IL 128373, ¶ 61. Our primary objective is to ascertain and give effect to the legislature's intent, which is most reliably indicated by the statute's language, when given its plain and ordinary meaning. *Id.* In determining the legislature's intent, we " 'may consider the reason and necessity for the law, the evils it was intended to remedy, and its ultimate aims.' " *People v. Taylor*, 2023 IL 128316, ¶ 45 (quoting *People v. Pullen*, 192 Ill. 2d 36, 42 (2000)).

¶ 25                         A. History of Section 8-4(c)(1)(E)

¶ 26    The State argues that defendant was not eligible for a Class 1 sentence under section 8-4(c)(1)(E), such that his attorney cannot be labeled ineffective for not seeking a reduced sentence under the statute. According to the State, section 8-4(c)(1)(E) is intended to parallel the offense of second degree murder in the attempted murder context. The State contends that, because defendant could not have reduced his offense to second degree murder had White died, he similarly cannot receive a Class 1 sentence for attempted murder just because White survived an intentional gunshot wound to the chest.

¶ 27    We look at the history of section 8-4(c)(1)(E) to provide context for the State's position. In *People v. Lopez*, 166 Ill. 2d 441, 451 (1995), this court held that the offense of attempted second degree murder does not exist in Illinois. First, we noted that second degree murder replaced the crime of voluntary manslaughter. *Id.* at 446. We stated that we had previously held in *People v. Reagan*, 99 Ill. 2d 238, 240-41 (1983), that the crime of attempted voluntary manslaughter based on an imperfect self-defense did not exist. *Lopez*, 166 Ill. 2d at 446. We reasoned in *Reagan* that attempted voluntary manslaughter would require an intent to kill with an unreasonable belief in the need to use deadly force in self-defense, but it was impossible to intend an unreasonable belief. *Id.*

¶ 28    We applied similar logic in *Lopez* in holding that the offense of attempted second degree murder does not exist. We stated that second degree murder had the same elements as first degree murder but that second degree murder was a lesser

mitigated offense. *Id.* at 447. The State must prove the elements of first degree murder beyond a reasonable doubt, and the defendant then has the burden to prove the existence of a mitigating factor. *Id.* We went on to state that the attempt statute required that a defendant intend to commit a specific offense, and thus the intent required for attempted second degree murder would be the intent to kill without lawful justification and with either a sudden passion or an unreasonable belief in the need for deadly force.[2] *Id.* at 448. We stated:

> "However, one cannot intend either a sudden and intense passion due to serious provocation or an unreasonable belief in the need to use deadly force. Moreover, concerning the mitigating factor of an imperfect self-defense, one cannot intend to unlawfully kill while at the same time intending to justifiably use deadly force." *Id.* at 448-49.

Therefore, attempted second degree murder would require that the defendant intend the presence of a mitigating factor, which was impossible. *Id.* at 449.

¶ 29    Justice McMorrow dissented in part, highlighting that, under the majority opinion, a defendant who killed someone when a statutory mitigating circumstance was present would be subject to a greater range of punishment if the victim lived rather than died. *Id.* at 452-53 (McMorrow, J., concurring in part and dissenting in part). That is, if the victim died, the defendant would be guilty of second degree murder, which was a Class 1 felony that allowed for probation. *Id.* at 453. However, if the victim lived, the defendant would be guilty of attempted first degree murder, which was a nonprobationable Class X felony with a greater sentencing range. *Id.*

¶ 30    Almost one decade later, in 2004, the "CLEAR" Commission began a multiyear undertaking to reform the Illinois Criminal Code. John Decker, *The Mission of the Criminal Law, Edit, Alignment, and Reform Commission (CLEAR): An Introductory Commentary*, 41 J. Marshall L. Rev. 611, 618 (2008). The CLEAR Commission was cochaired by former Illinois Governor James R. Thompson and former Illinois Appellate Court Justice Gino L. DiVito and was composed of 22 members. *Id.* The CLEAR Commission's tasks included addressing issues that had

---

[2]We note that we have allowed a petition for leave to appeal in *People v. Guy*, 2023 IL App (3d) 210423, *appeal allowed*, No. 129967 (Ill. Nov. 29, 2023), which raises the issue of whether the intent required for attempted first degree murder is the intent to kill or the intent to kill without lawful justification. We express no opinion on the subject here.

arisen in criminal law, including the one presented by *Lopez*. Michael P. Toomin, *Second Degree Murder and Attempted Murder: CLEAR's Efforts to Maneuver the Slippery Slope*, 41 J. Marshall L. Rev. 659, 659 (2008).

¶ 31    According to Judge Toomin, the CLEAR Commission considered amending the attempt statute or codifying the crime of attempted second degree murder, but neither of these proposals "carried the day." *Id.* at 699. The CLEAR Commission then settled on the language of section 8-4(c)(1)(E), so that "[c]omporting with decisional law, the offense of attempt[ed] second degree murder would remain undefined and unrecognized at law," but "[a]t the same time, defendants would have the opportunity to provide mitigating factors consistent with the rationale of second degree murder." *Id.;* see James R. Thompson *et al.*, *The Illinois Criminal Code of 2009: Providing Clarity in the Law*, 41 J. Marshall L. Rev. 815, 826 (2008) (section 8-4(c)(1)(E) was "designed to cure the problems that have been identified *** for the past twenty years regarding the interplay between the attempt statute and the crime of second-degree murder"). Legislators cited the CLEAR Commission when passing the bill that created section 8-4(c)(1)(E). 96th Ill. Gen Assem., Senate Proceedings, May 27, 2009, at 140; 96th Ill. Gen Assem., House Proceedings, May 29, 2009, at 37-48.

¶ 32                                      B. Serious Provocation

¶ 33    Returning to the State's argument, it asserts that defendant was not entitled to a Class 1 sentence because he was not acting "under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another." 720 ILCS 5/8-4(c)(1)(E) (West 2016). We have not interpreted this phrase in the context of section 8-4(c)(1)(E), but both the State and defendant argue that it should have the same meaning as nearly identical language in the second degree murder statute.

¶ 34    The second degree murder statute states:

"(a) A person commits the offense of second degree murder when he or she commits the offense of first degree murder *** and either of the following mitigating factors are present:

(1) at the time of the killing he or she is acting *under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill*, but he or she negligently or accidentally causes the death of the individual killed; or

(2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." (Emphasis added.) *Id.* § 9-2(a).

Thus, a person commits second degree murder when he commits first degree murder with one of two mitigating factors present, being either serious provocation or an unreasonable belief in the need for self-defense. *Id.*; *People v. McDonald*, 2016 IL 118882, ¶ 59. The second degree murder statute defined "[s]erious provocation" as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2016).[3]

¶ 35    We agree with the parties that we should construe the phrase "serious provocation" in section 8-4(c)(1)(E) in the same manner as the language in the second degree murder statute, upon which section 8-4(c)(1)(E) was based. In interpreting statutory language, we look at the statute as a whole, construing words and phrases in light of other relevant statutory provisions rather than in isolation. *Fair*, 2024 IL 128373, ¶ 61. Similarly, "[u]nder the doctrine of *in pari materia*, two legislative acts that address the same subject are considered with reference to one another, so that they may be given harmonious effect." *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 24. We further note that, when a term has a settled legal meaning, we will generally infer that the legislature intended to apply that meaning. *People v. Perez*, 2014 IL 115927, ¶ 9.

---

[3]The definition was amended in 2018 and now states:

"Serious provocation is conduct sufficient to excite an intense passion in a reasonable person provided, however, that an action that does not otherwise constitute serious provocation cannot qualify as serious provocation because of the discovery, knowledge, or disclosure of the victim's sexual orientation as defined in Section 1-103 of the Illinois Human Rights Act." 720 ILCS 5/9-2(b) (West 2022).

See Pub. Act 100-460 (eff. Jan. 1, 2018).

¶ 36     This court has established four categories of serious provocation: (1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. Agee*, 2023 IL 128413, ¶ 81. Defendant asserts that the first two categories are relevant here. The State points out that in *Agee*, we held that a defendant who sustained only a scratch on his forehead caused by a slap from the victim did not establish a substantial physical injury or assault. The State argues that, similarly, White's actions in this case, and the lack of injury to defendant, do not amount to a substantial physical injury or assault. Therefore, the only relevant category is mutual combat.

¶ 37     We agree with the State. Although White testified that he punched defendant multiple times, Virgetta did not see any injuries on defendant when he left the bus. Further, defendant was able to climb over people and run off the bus, and he was walking outside on a December night when the police first saw him. Though defendant had a gunshot wound to his hand, this injury was caused by his own gun, which by all accounts never left his possession. Defendant has the burden of showing ineffective assistance of counsel, and the record contains insufficient support for his claim of substantial physical injury or assault. Defendant counters that his counsel would have been able to introduce such evidence at sentencing, but this assertion is entirely speculative and rebutted by the evidence presented at trial. See *People v. Lewis*, 2022 IL 126705, ¶ 46 ("*Strickland* requires a defendant to 'affirmatively prove' that prejudice resulted from counsel's errors."); *People v. Williams*, 139 Ill. 2d 1, 12 (1990) (speculative allegations and conclusory statements are insufficient to establish ineffective assistance of counsel).

¶ 38     Therefore, only mutual combat remains. We examined that category extensively in *People v. Austin*, 133 Ill. 2d 118 (1989). There, according to the defendant's version of events, a bus driver hit her hand with a transfer punch after the defendant wrongfully tried to take a bus transfer. *Id.* at 122. The defendant hit the driver in retaliation, and a physical fight ensued. *Id.* Defendant fired a gun into the bus's floor. The driver was able to force the defendant off the bus, at which point the defendant shot and killed the driver. *Id.*

¶ 39     The defendant sought a voluntary manslaughter instruction based on serious provocation. *Id.* at 123. The trial court denied the instruction, but the appellate court held that the defendant was entitled to the instruction. *Id.* It stated that there was a

dispute about who the aggressor was and that there was enough evidence of serious provocation based on the passengers' testimony, the defendant's and the driver's similar size, and injuries that the defendant sustained. *Id.*

¶ 40    This court determined that there was not even some evidence of serious provocation based on mutual combat that would justify the jury instruction. *Id.* at 123-25. We stated that "[m]utual combat is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *Id.* at 125. We further stated that, if a person instigates combat, she cannot rely on the victim's response as evidence of mutual combat *Id.* at 126. We stated that the defendant had instigated the combat by attempting to steal a bus transfer, and the bus driver struck the defendant's hand in response to the illegal act. *Id.* We held that the defendant could not rely on the driver's response to defeat the fact that the defendant instigated the combat or as evidence that the driver willingly entered the fight. *Id.*

¶ 41    We further determined that the fight was not on equal terms. *Id.* We stated that the provocation by the victim must cause a passionate state of mind in an ordinary person under the same circumstances and that "[a] slight provocation is not enough, because the provocation must be proportionate to the manner in which the accused retaliated." *Id.* at 126-27. We stated that the death is murder when the defendant attacks a victim with violence out of all proportion to the provocation, especially if the defendant kills the victim with a deadly weapon. *Id.* at 127. We concluded that there was no evidence to objectively indicate that the defendant had reason to fear for her life, such that shooting the driver was completely out of proportion to the provocation, and mutual combat could not apply. *Id.*

¶ 42    Defendant contends that *Austin*'s "slight provocation" language is misleading because a showing of "serious provocation" is already required by statute and that the issue of proportionality is really a question of whether serious provocation existed. Defendant argues that the analysis is therefore not focused on whether the defendant's response is proportionate to the victim's provocation.

¶ 43    Defendant asserts that there was serious provocation in this case. Defendant claims that White was the initial aggressor because he charged at defendant and punched him in the face. The two men fell, with White, who was 300 pounds, on

- 12 -

top. White then punched defendant six or seven more times. Defendant argues that White was still swinging at him when White was shot. Defendant maintains that, unlike *Austin*, White entered the struggle willingly, the fight was on equal terms, and defendant's actions were not disproportionate to White's serious provocation.

¶ 44 Defendant additionally points to the appellate court's analysis of this issue. The appellate court reasoned that if a person is found guilty of attempted first degree murder, thereby having the specific intent to kill, disproportionality essentially has already been decided and cannot be an absolute bar to applying section 8-4(c)(1)(E). 2023 IL App (1st) 220296, ¶ 41.

¶ 45 The State argues that specific intent is distinct from disproportionality. It uses the example that one can intend to kill someone with a knife in mutual combat but still act proportionately if his opponent was similarly armed. Defendant responds that the State's example highlights the problem with the idea of disproportionality, because under such a scenario, the defendant's actions would likely have been legally justified.

¶ 46 Defendant is correct that section 8-4(c)(1)(E) requires "serious provocation." Mutual combat is a category of serious provocation. However, just because there has been a physical fight at some point during the incident or even at the time of the attempted murder, it will not always equate to serious provocation. In *Austin*, we stated that "[a]t the most, the victim provoked defendant by engaging in a 'fairly even' fistfight for 30 to 40 seconds and forcing her off the bus." *Austin*, 133 Ill. 2d at 127. We had defined mutual combat as a fight that both parties willingly enter into or where they "mutually *fight upon equal terms*," which implicates proportionality. (Emphasis added.) *Id.* at 125. We then emphasized proportionality in stating that "[a] slight provocation is not enough, because the provocation must be proportionate to the manner in which the accused retaliated." *Id.* at 126-27. We concluded that mutual combat did not occur because the defendant instigated the combat and because shooting the unarmed victim was completely out of proportion to the provocation. *Id.* at 127. Proportionality therefore remains a relevant consideration in determining whether mutual combat applies.

¶ 47 Contrary to the appellate court's logic, a specific intent to kill does not mean that a defendant's response is always disproportionate. For example, both parties could be armed with similar weapons, or the defendant may be using his hands

- 13 -

while the victim has a knife. These scenarios do not automatically result in the defendant's conduct being legally justified, because, among other possibilities, the victim may have been defending himself.

¶ 48      We conclude that serious provocation is inapplicable under the facts of this case. Again, where a person instigates the combat or is the aggressor, he cannot rely on the victim's response as evidence of mutual combat *Id.* at 126. Here, White charged at defendant and began hitting him only because defendant was hitting and choking Virgetta. Therefore, as in *Austin*, White's actions were not a willing entry into the fight but rather a response to defendant's violent conduct toward White's family member. Additionally, the fight was not on "equal terms" because the men were engaged in a fist fight before defendant took out his gun and shot White in the chest. Like *Austin*, shooting White was entirely disproportionate to the claimed provocation, especially because defendant's response involved a deadly weapon. See *id.* at 127; see also *McDonald*, 2016 IL 118882, ¶ 65 (there was insufficient evidence of serious provocation based on mutual combat where, even if the victim had hit the defendant, the defendant's response of stabbing the unarmed victim three times was "completely out of proportion to the provocation"). For these reasons, defendant could not have shown serious provocation by a preponderance of the evidence at sentencing.

¶ 49      C. Whether Section 8-4(c)(1)(E) Creates<br>Alternative Scenarios

¶ 50      Defendant additionally argues that section 8-4(c)(1)(E) creates alternative scenarios whereby a defendant can mitigate his sentence for attempted murder if he can prove by a preponderance of evidence at sentencing that either

> "he or she was acting under a sudden and intense passion resulting from [(1)] serious provocation by the individual whom the defendant endeavored to kill, or [(2)] [serious provocation by] another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death." 720 ILCS 5/8-4(c)(1)(E) (West 2016).

Defendant argues that the statutory language is ambiguous as to whether it is disjunctive or whether it contains two elements that must both be proven, and we

should adopt the former interpretation based on the statute's plain language, the legislative intent, comparison to the second degree murder statute, and the rule of lenity. Defendant recognizes that the appellate court below interpreted the statute conjunctively (see 2023 IL App (1st) 220296, ¶¶ 29, 44), but he cites *People v. Taylor*, 2016 IL App (1st) 141251, ¶ 22, where the appellate court came to the opposite conclusion that "the statutory language clearly addresses two separate scenarios."

¶ 51       We do not resolve this issue here because even defendant's alternative scenarios approach requires a showing of serious provocation, which cannot be supported by the evidence in this case. Correspondingly, defendant is unable to show that his counsel's performance was deficient in not seeking a reduced sentence under section 8-4(c)(1)(E) or that defendant suffered prejudice due to counsel's decision. Defendant's claim of ineffective assistance of counsel therefore fails.

¶ 52                                    III. CONCLUSION

¶ 53       For the reasons stated, we reverse the judgment of the appellate court that vacated defendant's sentence and remanded for resentencing.

¶ 54       Appellate court judgment reversed.

¶ 55       Circuit court judgment affirmed.

¶ 56       Cause remanded.