# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***People v. Teague*, 2013 IL App (1st) 110349**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BENNIE TEAGUE, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-0349 |
| Filed | February 15, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed defendant's convictions for the murder of his former employer and the attempted murder of three officers who pursued him after his employer was shot and upheld his sentences totaling 135 years, notwithstanding defendant's contentions that the State failed to prove he intended to kill the officers and that the punishment was excessive, since the jury was entitled to reject the argument that defendant's failure to hit any of the officers or their car with his assault rifle was evidence of a lack of intent. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-9479; the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and La Roi Williams, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.

Presiding Justice Lampkin and Justice Hall concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant Bennie Teague was convicted of the first-degree murder of his former employer, Marcus Hendricks, and of attempted first-degree murder of three police officers, which occurred while defendant was trying to evade capture for the murder of Hendricks earlier that same day. The jury also determined that defendant had personally discharged the firearm that caused Hendricks' death. After hearing factors in aggravation and mitigation, the trial court sentenced defendant to 85 years for the first-degree murder of Hendricks, which included a 25-year enhancement for personally discharging the firearm that caused Hendricks' death. The trial court also sentenced defendant to 50 years for each conviction for attempted murder to run concurrently with each other but consecutively to the 85-year sentence for murder. As a result, defendant was sentenced to serve a total of 135 years in the Illinois Department of Corrections (IDOC).

¶ 2     On this direct appeal, defendant raises two claims: (1) that the State failed to prove beyond a reasonable doubt that he intended to kill the police officers; and (2) that the trial court abused its discretion by sentencing defendant to a total of 135 years.

¶ 3     On appeal, defendant does not claim that there was insufficient evidence to support his conviction for the murder of Hendricks. He makes a claim of insufficient evidence only with respect to his convictions for the attempted murders of the three police officers. In addition, he does not claim that the State failed to prove that he took a substantial step toward committing the attempted murders; he claims only that the State failed to prove that he had the intent to kill.

¶ 4     With respect to the attempted murders, defendant admits in his brief to this court that he shot an AK-47 semiautomatic assault rifle 5 times from a distance of 40 feet away "in the officers' presence in an effort to keep them at bay while he attempted to escape" capture for the murder of Hendricks. However, defendant claims that the State's evidence was insufficient to prove that he intended to kill the officers, since there was no evidence that his shots actually hit either the officers or their vehicle.

¶ 5    For the reasons discussed below, we affirm his conviction and sentence.

¶ 6                                    BACKGROUND

¶ 7    At trial, the State's evidence established that defendant, who had worked for Marcus Hendricks, entered Hendricks' plumbing business at 714 West 115th Street in Chicago on April 18, 2008, at 6:30 p.m. and shot Hendricks. When defendant entered Hendricks' business, he was wearing a cloth around his head that masked the lower part of his face and was carrying a rifle. After the shooting, Hendricks was found sitting in a chair with his feet propped up on a desk and he later died from a gunshot wound to his abdomen. No evidence was offered concerning a motive for the Hendricks murder.

¶ 8    After the murder, defendant walked to 113th Street, entered a teal-colored vehicle, and drove north on Emerald Avenue and then east onto 112th Street. Officers John McDermott, Edward Kos and Dean Korbas, who were nearby in plain clothes in an unmarked vehicle, received a radio dispatch and headed to the area. As the officers were driving south on Emerald Avenue, a vehicle passed them heading north, driven by the man whom they identified in court as defendant. After defendant passed the officers, he drove away at a high rate of speed and the officers made a U-turn to follow him and activated their emergency lights and siren. After a pursuit that lasted a number of blocks, defendant's vehicle stopped at 111th Street and Lowe Avenue, and defendant exited his vehicle carrying an assault rifle. The police officers immediately stopped their vehicle as well.

¶ 9    The attempted murder charges were based on events that occurred after defendant stopped and exited his vehicle, and the officers stopped their vehicle. Since defendant exercised his right not to testify at trial, the evidence of his intent during these events was based primarily on a description of his actions as provided by the testimony of the three officers. We provide the officers' testimony in detail as follows.

¶ 10    Officer John McDermott testified that, after defendant exited his vehicle, he immediately turned around and faced the officers, from approximately 40 feet away. McDermott observed defendant raise his rifle to his shoulder and observed a ball of fire and heard a loud crack. Defendant began walking forward in "an arc" toward the left side of the officer's vehicle. McDermott was sitting in the driver's seat, Korbas was sitting in the front passenger seat, and Kos was sitting in the backseat. McDermott and Korbas returned fire through the front windshield of their vehicle. After firing six shots, McDermott had used up all of his ammunition and began to reload, while Korbas continued to fire. McDermott could still observe balls of fire emanating from defendant's rifle.

¶ 11    McDermott testified that, while shooting, defendant began "trotting" backward. Korbas and Kos both exited their vehicle, while McDermott was still in the process of reloading. Defendant ran approximately two house lengths and then turned around, shouldered his rifle and fired again. McDermott, who was still in the vehicle, "believed" that defendant "directed" the rifle toward the other officers at that point in time. Although McDermott admitted that he was not looking at his partners, he testified that defendant's shot was aimed "more toward" his partners. Defendant then disappeared between two houses, and McDermott drove around the block, while Kos and Korbas pursued defendant on foot.

Korbas and additional officers who arrived at the scene found defendant in a gangway between two houses and were placing him under arrest when McDermott arrived.

¶ 12    Officer Kos testified that, after defendant exited his vehicle, he turned around and shouldered a rifle with the muzzle pointing at the officers' vehicle. Kos then observed a "big fire ball" coming toward the officers. Since Kos was sitting in the backseat, he drew his weapon but did not return fire because he was afraid of hitting McDermott, who was sitting in front of him. McDermott and Korbas, who were sitting in the front, returned fire through the windshield. Kos observed defendant moving closer to the police vehicle and then observed another fire ball emerge from defendant's rifle in their direction. Kos then exited the vehicle, radioed for help and chased defendant on foot. Defendant turned around and "pointed the rifle towards" Kos but then he "moved a little to the left and discharged it again." Kos explained that defendant "pointed the rifle in my direction first, *** but then he like made a 25 degree [move] to the left, and that's when he discharged the rifle." When Kos looked in the direction where the fire ball was traveling, he observed "Korbas duck down." Kos lost sight of defendant when defendant ran between two houses, and Kos ran down an alley in an attempt to pursue him. As Kos was looking for defendant, he heard Korbas yelling to defendant to lay on the ground.

¶ 13    Officer Korbas testified that, after defendant stopped his vehicle by "slamm[ing] on the brake, [he] had his door open, and came out and raised an AK 47 at us." Korbas estimated that their police vehicle was only 40 feet behind defendant's vehicle. As Korbas "was going down for cover," he observed a flame emerge from the muzzle of defendant's rifle and heard a loud blast. Korbas and McDermott returned fire through the front windshield of their vehicle. Defendant approached the police vehicle toward the driver's side. While McDermott was in the process of reloading, Korbas continued to return fire. Defendant started running down Lowe Avenue, and Korbas exited the police vehicle and pursued him on foot. Defendant turned and Korbas observed another flash from defendant's rifle, before defendant ran between two houses. Korbas pursued defendant, and he later observed other officers arrest and handcuff defendant.

¶ 14    John Miller, a crime scene investigator with the Chicago police department, testified that there was no damage to the police vehicle except to the windshield and that there were bullet strikes on the pavement in front of the vehicle. Miller also testified that he recovered five 7.62-by-39 caliber fired cartridge cases in the area and that they were consistent with the military assault rifle that he recovered from under the deck of a house near where defendant was arrested. Fred Tomasek, an expert in the area of firearms identification with the Illinois State Police, testified that the rifle was an AK-47 semiautomatic rifle and that the five fired cartridge cases had been fired from the rifle.

¶ 15    Based on this forensic testimony and the testimony of the three officers, defense counsel argued during closing statements that the State failed to prove that defendant had an intent to kill the officers. Defendant disputes only the inferences that can be drawn from his acts with respect to his intent. Although the defense made other arguments during its closing statements, we discuss this argument in detail since it is the issue on appeal.

¶ 16    Specifically, defense counsel argued that the officers' vehicle suffered no damage except

-4-

what the officers themselves had caused and that none of the officers had been injured. Relying primarily on the officers' testimony, defense counsel argued that their description of events actually proved defendant's lack of intent. First, defense counsel argued that Officer Kos had testified that defendant had veered his rifle to the side at one time rather than take aim directly at Officer Kos:

> "[T]he officer *** said at one point while he's running out of his car *** [defendant] had the gun pointed in that direction, moved about 25 degrees and then shot. Clearly there was no intention to shoot and kill police officers. Officer Kos said that. He was right at me and then he moved 25 degrees and shot."

Next, defense counsel observed that, although Officer McDermott testified that defendant moved closer to the police vehicle, there was still no damage to the police vehicle from defendant's rifle:

> "Now, there was what the police officers testified to and whatever happened out there was an extremely horrifying scene. Because the officers were so convinced that they were going to be killed they fired their weapon right through the windshield of the car that they were in. Clearly, they believed that they were going to be shot. You know, the example that [the prosecutor] gave a little while ago about playing and about you point at somebody and you say bang, bang, you're dead and that person is supposed to fall down, well, the car, the police officers' car doesn't have one mark on it from an AK47 bullet. As a matter of fact, there's no damage to the police car at all except for what the police did themselves. I understand why they–one would understand why they did it, but there–if [defendant] were out there and was shooting at this police car and he shot five times and they kept saying he took aim and just fired, it doesn't come close to the police car.

> Clearly, if it were [defendant] out there firing he was not intending to kill the police officers. I believe Officer McDermott and one of the other officers said that [defendant] *** made some kind of an arc or something. They're suggesting he was coming closer. *** Even when closer there is no damage to the vehicle. Maybe the person wanted to get away with that AL47[,] there's no damage to that squad [car] whatsoever. There is clearly no evidence that the person shooting was attempting to kill any of the police officers."

Toward the end of his closing, defense counsel reiterated that Officer Kos had testified that defendant had pointed his rifle at Kos and then moved it away:

> "There were a couple things that I wanted to address, things that the State said and, again, although [the prosecutor] says that my client is aiming at the police you've got Officer Kos *** saying he appeared to be pointing his weapon at cops 25 degrees and then fired his gun. Nothing is ever hit. *** There's nothing to indicate that there was any kind of intent to kill."

¶ 17    After hearing the evidence and argument, the jury found defendant guilty of three counts of attempted first-degree murder of a peace officer, namely, Officers McDermott, Kos and Korbas. The jury also found defendant guilty of the first-degree murder of Hendricks and determined that defendant had personally discharged the firearm that proximately caused

-5-

Hendricks' death.

¶ 18    After denying defendant's posttrial motion for a new trial, the trial court sentenced defendant to 85 years for the first-degree murder of Hendricks, which included a mandatory 25-year enhancement for discharging a firearm that proximately caused Hendricks' death. The trial court also sentenced defendant for 50 years for each conviction for attempted first-degree murder. The trial court ordered that the sentences for attempted murder were to be served concurrently to each other but consecutively to the murder sentence, resulting in a total of 135 years. The trial court then denied defendant's motion to reconsider his sentence, and this appeal followed.

¶ 19                                        ANALYSIS

¶ 20    On this direct appeal, defendant raises two claims: (1) that the evidence at trial was insufficient to support his convictions for attempted murder because the State failed to prove beyond a reasonable doubt that he intended to kill the attempted-murder victims; and (2) that the trial court abused its discretion by sentencing defendant to a total of 135 years with IDOC. For the reasons discussed below, we affirm defendant's conviction and sentence.

¶ 21                              I. Sufficiency of the Evidence

¶ 22    First, defendant claims that the State failed to prove beyond a reasonable doubt that he intended to kill the three peace officers. To prove a defendant guilty of attempted murder, the State must prove: (1) that defendant performed an act that constituted a substantial step toward committing a murder; and (2) that he had the criminal intent to kill the victim. *People v. Green*, 339 Ill. App. 3d 443, 451 (2003). On this appeal, defendant contests only the second element, which is that he had no intent to kill the police officers.

¶ 23    When a defendant challenges the sufficiency of the evidence, our standard of review is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 24    On appeal, defendant claims that no rational trier of fact could have found that he had an intent to kill the officers. This court has observed that, since intent to kill is a state of mind, it is "usually difficult to establish by direct evidence" and thus it is usually "inferred from the surrounding circumstances." *People v. Parker*, 311 Ill. App. 3d 80, 89 (1999); *People v. Jones*, 55 Ill. App. 3d 446, 451 (1977). See also *People v. Williams*, 165 Ill. 2d 51, 64 (1995); *In re Stern*, 124 Ill. 2d 310, 315 (1988). These surrounding circumstances may include the character of the assault, the use of a deadly weapon, and the nature and extent of the victim's injuries. *Green*, 339 Ill. App. 3d at 451; *Parker*, 311 Ill. App. 3d at 89. See also *Williams*, 165 Ill. 2d at 64.

¶ 25    Defendant claims that no rational trier of fact could have found that he intended to kill the officers because, although he was firing an AK-47 semiautomatic assault rifle from a distance of only 40 feet away, there was no evidence that his shots hit either the officers or

their vehicle. Defendant claims that the only plausible explanation for his poor marksmanship is that he had no intent to hit the officers, and that he was only trying to keep them at bay while he attempted to escape.

¶ 26      When a defendant challenges the sufficiency of the evidence, it is not the function of the reviewing court to "retry" the defendant (*People v. Wheeler*, 226 Ill. 2d 92, 114 (2007)) or "to substitute its judgment for that of the fact finder" (*People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009)). It is the responsibility of the fact finder, not the reviewing court, to determine the credibility of witnesses, to resolve any conflicts in the evidence and to draw reasonable inferences from the evidence. *Jackson*, 232 Ill. 2d at 280-81. " 'The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) (quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978)). See also *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (a fact finder could reasonably infer an intent to kill "from the act of firing two bullets in the direction of an occupied car and a crowded street"); *Green*, 339 Ill. App. 3d at 451-52 (a jury could reasonably infer an intent to kill from evidence that defendant fired a pistol four to five times in the direction of officers seated in a vehicle, even though defendant missed them at close range); *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (defendant's "conduct in shooting down a breezeway in which several people were running is sufficient evidence to prove a specific intent to kill").

¶ 27      Poor marksmanship is not a defense to attempted murder, and it is a question of fact for the jury to determine whether defendant lacked the intent to kill or whether defendant was simply unskilled with his weapon and missed his targets. *Green*, 339 Ill. App. 3d at 451-52; *People v. Johnson*, 331 Ill. App. 3d 239, 251 (2002) ("While none of the shots fired by defendant actually struck [the victim], poor marksmanship is not a defense to attempted first degree murder.").

¶ 28      In *Green*, defendant made virtually the same argument that defendant makes here. "Specifically, Green argue[d] that had he intended to hit the officers, he could not possibly have missed at close range *** and the fact that no officer was struck is therefore sufficient to raise a doubt as to his intent to kill when he fired the shots." *Green*, 339 Ill. App. 3d at 451. In rejecting Green's argument, we explained that the defense "could reasonably argue that the fact that Green failed to strike the officers could support an inference that he lacked the intent to kill. However, that fact also supports the alternative inference that Green was simply unskilled and missed his targets. The decision as to which of competing inferences to draw from the evidence is the responsibility of the trier of fact." *Green*, 339 Ill. App. 3d at 451-52.

¶ 29      Similarly, in the case at bar, defendant was free to argue to the jury that his failure to hit the officers supported an inference that he lacked the intent to kill them. However, as in *Green*, the jury in the case at bar was also free to reject that argument and to draw instead the competing inference that defendant was simply an unskilled shooter. The decision belonged to the jurors, and we will not substitute our judgment for theirs on appeal. *Jackson*, 232 Ill. 2d at 280-81 (when a defendant challenges the sufficiency of the evidence on appeal, the reviewing court will not "substitute its judgment for that of the fact finder"). Thus, we affirm defendant's convictions for attempted murder.

¶ 30                                              II. Sentencing

¶ 31     Defendant's second claim is that the trial court abused its discretion when it sentenced defendant, who was 39 years old at the time of the offense, to a total of 135 years, where defendant was from a troubled home, where defendant did not have a criminal background with an extensive history of violence, and where defendant claimed to have rehabilitative potential as shown by his associate college degree and several certificates from educational institutions.

¶ 32     A reviewing court will disturb a trial court's sentencing decision only if the trial court abused its discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 33     " 'A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the "cold" record.' " *Alexander*, 239 Ill. 2d at 212-13 (quoting *People v. Fern*, 189 Ill. 2d 48, 53 (1999)). " 'The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently.' " *Alexander*, 239 Ill. 2d at 213 (quoting *Stacey*, 193 Ill. 2d at 209).

¶ 34     In the case at bar, defendant does not claim that the trial court considered any improper factors at sentencing. In addition, defendant states in his brief to this court that his counsel fully informed the trial court at sentencing of all the mitigating information that he now brings to our attention on appeal. Defendant contests only the manner in which the trial court weighed this information.

¶ 35     In his brief to us, defendant argues that, since "the trial court effectively imposed a sentence of natural life in prison without parole," it eliminated any possibility for rehabilitation and thus violated the Illinois Constitution's requirement that a sentencing court must consider an offender's rehabilitative potential.

¶ 36     What defendant overlooks is that our constitution also requires a sentencing court to consider the seriousness of the offense. Our constitution states that: "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has admonished its appellate courts that a defendant's rehabilitative potential is not entitled to a greater weight than the seriousness of the offense. *Alexander*, 239 Ill. 2d at 214; *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). At sentencing, the State presented the victim impact statement of Sharon Hendricks, the mother of the murder victim, who stated that her son had hired defendant through an ex-offender reentry program and that her son would defend defendant when others complained that he was weird, different and difficult to work with. The evidence at trial showed that defendant had shot Hendricks, his former employer, while Hendricks sat at his desk with his feet up. The trial court stated:

"I have been involved in this criminal justice system for over 20 years now, 14 years of it as a judge. I consider this defendant and this particular murder, among the most cruel and heartless and calculated cold[-]blooded murders that I've ever encountered. Then after [defendant] commits this murder, he leads the Chicago Police Officers on a chase through the streets of our City and opens fire on three Chicago Police Officers in a residential neighborhood, and then continues to fire at them. In fact, he's firing a shot as he was trying to make his final escape ***."

In addition, defendant's criminal history report reveals several prior convictions for weapons offenses, including armed robbery and three convictions for unlawful use of a weapon.

¶ 37   Despite the seriousness of his present and past offenses, defendant asks this court to reduce his sentence. In *Alexander*, our supreme court reversed the appellate court when it reduced defendant's 24-year sentence for aggravated discharge of a firearm. *Alexander*, 239 Ill. 2d at 208, 215 (sentenced as a Class X offender). In *Alexander*, the State's evidence at trial established that the 15-year-old defendant had fired five shots in a crowded school hallway. *Alexander*, 239 Ill. 2d at 208, 213-14. As in the case at bar, the defendant in *Alexander* argued that his sentence failed to consider his troubled background or his potential for rehabilitation. *Alexander*, 239 Ill. 2d at 214. Finding that his sentence was not disproportionate, our supreme court observed that the five shots were fired into a group of people "with total disregard for the potential harm to others." *Alexander*, 239 Ill. 2d at 214.

¶ 38   Similarly, in the case at bar, the State's evidence established that defendant fired multiple shots at a group of officers, on a residential street, with total disregard for the potential harm to others. However, in the case at bar, defendant was not a 15-year-old schoolboy as in *Alexander* but a 39-year-old man who had received prior opportunities for rehabilitation. During defendant's trial, a bystander testified that, when the shooting started in the street, the bystander shoved to the ground three children who had been playing in front of his grandmother's house and tried to shield them with his body by lying on top of them. Fortunately, no one was hit.

¶ 39   Having reviewed all the factors in mitigation and aggravation presented at sentencing, and having considered our constitution's twin goals of retribution and rehabilitation, we cannot find that the trial court abused its discretion in sentencing defendant.

¶ 40                              CONCLUSION

¶ 41   For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 42   Affirmed.