2023 IL App (1st) 220296
No. 1-22-0296
Opinion filed June 2, 2023

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 CR 00867 |
| VICTOR HAYNES, | ) ) | The Honorable Michael J. Hood, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Justice Tailor concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Defendant Victor Haynes was convicted after a bench trial of the attempted first degree murder of Jerome White (hereinafter, White). The trial court sentenced defendant to the minimum sentence, which was 31 years with the Illinois Department of Corrections. The 31-year sentence included a 25-year mandatory sentencing enhancement for personally discharging a firearm. See 720 ILCS 5/8-4(c)(1)(D) (West 2016) (sentencing enhancement).

¶ 2    On this direct appeal, defendant first challenges his conviction, by claiming that the State failed to prove beyond a reasonable doubt that he had an intent to kill. Second,

defendant challenges his sentence, by claiming that his counsel was ineffective for failing to seek a sentence reduction pursuant to section 8-4(c)(1)(E) of the Criminal Code of 2012 (Code) (720 ILCS 5/8-4(c)(1)(E) (West 2016)). This subsection permits a sentence reduction if the defendant proves by a preponderance of the evidence at sentencing that he "was acting under a sudden and intense passion resulting from serious provocation" *and*, that, if "the individual the defendant endeavored to kill [had] died, the defendant would have negligently or accidentally caused that death." 720 ILCS 5/8-4(c)(1)(E) (West 2016). Third, defendant seeks a remand for a *Krankel* hearing (*People v. Krankel*, 102 Ill.2d 181 (1984)), on the ground that the trial court failed to inquire regarding his allegation at sentencing that his counsel had failed to pursue a possible line of investigation. For the following reasons, we affirm his conviction but vacate his sentence and remand for resentencing.

¶ 3                                    I. BACKGROUND

¶ 4        The relevant events occurred on a party bus rented to celebrate the birthday of Virgetta White (hereinafter, Virgetta). The bus was rented by Virgetta's uncle, Jerome White, and by Virgetta's cousin, Nathal Williams (hereinafter, Williams). At trial, defendant was charged with the attempted murder of both men. While the trial court found defendant guilty of the attempted murder of White, the court acquitted defendant of the attempted murder of Williams. The witnesses at trial included event witnesses White, Virgetta, and Crystal Massey, who were all on the bus.

¶ 5        The evidence at trial established that the bus departed on December 17, 2016, from West 13th Street and South Karlov Avenue at 8 p.m. with Virgetta[1] and approximately two

---

[1]Since Virgetta and her uncle Jerome share the same last name, we will refer to Jerome by his last name and Virgetta by her first name.

dozen of her friends and family members. They brought alcohol on the bus, but no food. After driving to a nearby train station to pick up a cousin, they drove back to 13th Street and Karlov Avenue, where defendant and James Staples (hereinafter Staples) boarded the bus. Virgetta did not know defendant but JK, whom Virgetta had previously dated, and Staples, JK's cousin, asked if defendant could come. Virgetta said yes.

¶ 6     At some point in the evening, JK and defendant began arguing on the bus. Virgetta got in between them, and Virgetta and defendant began physically fighting. After hearing that Virgetta had been punched, White ran from the front of the bus to the back, moved Virgetta out of the way, and punched defendant in the face. White and defendant began fighting, with White on top of defendant. White smelled gunpowder, stood up, realized he had been shot, and then fell down with blood on his shirt. White testified that he did not bring a gun on the bus. After White fell, Williams began fighting with defendant. White testified that, as Williams and defendant fought, White observed that Williams and defendant were fighting over something black in defendant's hand. Two more shots were fired, and Williams fell down. As defendant climbed over people on the bus to escape, Virgetta saw a black gun in his hand. Crystal Massey, a friend of Virgetta and a cousin of Williams, also observed a black gun in defendant's hand. Both defendant and Stapes ran off the bus.

¶ 7     After receiving a report of shots fired and a description of the offenders, two officers on patrol observed two men matching the offenders' description and followed them. At approximately 2 a.m. on December 18, 2016, Officer Gilberto Nieto and his partner followed defendant and Staples to the foyer of a residential building on Lake Shore Drive, where the officers recovered a small black gun from under a bench in the foyer. Defendant had a gunshot wound to his left hand.

¶ 8        A firearms expert, Mark Pomerance, testified that two fired cartridge cases recovered from the bus were fired by the gun recovered from the foyer, but he was unable to determine if a live round found on the bus had also been ejected from the same gun. Pomerance testified that if one person was gripping the gun in a firing position, another person could hit the gun's slide during a struggle and discharge the gun. The gun was a semiautomatic pistol, with a slide on top. At the time that the gun was recovered, it contained two more bullets.

¶ 9        As a result of the shooting, White had several surgeries. On the date of trial, he still had a bullet lodged under his heart. Williams, the other victim, remained in a hospital bed on life support, in a vegetative state, and unable to communicate.

¶ 10        During closing, the State argued to the court that "defendant was the initial aggressor here." Defense counsel responded: "It's not self-defense, Judge." Counsel argued that the shooting was not in self-defense but rather an accident that occurred during a struggle:

"Now, I think—I don't know if I'm going to shorten [the State's rebuttal] closing or not—but I received some case law yesterday, which I reviewed, all having to do with self-defense. And I listened to [the State's] argument here, and they talked about self-defense. It's not self-defense, Judge.

And they talk about initial aggressor. And I'm going to put this aside. *** [I]n relation to [Virgetta] okay, where he may or may not be the initial aggressor, okay, and had he shot [Virgetta]—[but] he's not charged with anything against [Virgetta]. *** So now when [White] comes charging across the bus *** [defendant] is no longer the aggressor. Okay? But let's put that aside because I'm not even going to argue self-defense.

And the reason being, Judge, self-defense, the theory of self-defense is you do it, you take this action not accidentally, not negligently, not recklessly, you take these actions purposefully. There's a purpose in your mind. The purpose is to defend yourself against imminent death or great bodily harm. You're defending yourself against imminent death or great bodily harm. And though [defendant] may have thought at that moment by [White] charging at him, [defendant] doesn't at that point, at any point— no witness ever testifies that [defendant] aims, points, raises in any way, shape, or form that gun in the direction of anybody."

Defense counsel argued that defendant and White, and subsequently Williams, were "tussling" over the gun when the gun fired. Counsel argued that this "tussling" was inconsistent with defendant's cocking and shooting a gun but was consistent with somebody touching the slide and thereby causing a bullet to discharge.

¶ 11    At the end of the bench trial, the trial court found defendant not guilty of the charges related to Williams. The court found, based on White's testimony, that Williams and defendant were struggling over the gun when it went off and struck Williams. As a result, the court stated that it could not find defendant guilty beyond a reasonable doubt of the charges related to Williams. However, it found defendant guilty of the attempted murder of White, the aggravated battery of White, and unlawful use of a weapon by a felon. The other charges later merged into the attempted murder conviction.

¶ 12    Prior to sentencing, the trial court stated that it wanted to make "an additional record on the case" in order to "clarify" its findings. The trial court stated:

"With regard to Jerome White, I made a finding that the defendant knowingly discharged a firearm causing injury to Jerome White. I also found beyond a reasonable

5

doubt his intent was to kill Jerome White. To that, the Court looks to the nature and circumstances of the event. I don't know if I was clear on the record, so I'll state it now ***.

The defendant boarded the bus with a deadly weapon; a weapon he could not legally carry. He was involved in a fist fight with the victim White. He was able to pull a deadly weapon, handgun somewhere—from somewhere secreted on his person and shoot him in the chest. He didn't shoot to maim or injure. He shot to kill. Based on the location of the gunshot wound, the location of the injuries is indicia of the intent. The nature and circumstances of the injury are indicia of intent. The evidence is that he voluntarily and willfully committed an act. His natural tendency was to destroy another's life with regard to Mr. Jerome White. He then fled the scene, also indicia of guilt."

¶ 13    Defense counsel asked the court to reconsider its findings. In making this argument, counsel discussed intent:

"I indicated [in defendant's answer] that I may or may not assert the defense of self-defense but did not argue it. And the reason I didn't argue it is because in order for it to be *** self-defense *** it has to be an act that he's taking for a purpose ***. When it's an accident, it's not self-defense."

Counsel argued that "the court has to find the specific intent and the nature of the injuries in and of themselves aren't sufficient to show the intent" in the case at bar.

¶ 14    In response, the trial court further found:

"With regard to Jerome White, this was not an accident. Now, I based my finding on a totality of the circumstances; certainly location of the wound, gravity of the wound, all of those factors I considered. ***

There was no tussle over—there's no testimony that there was a struggle over a gun with regard to Jerome White. A struggle over the gun involved Nathall Williams and [defendant], that's what the testimony of Jerome White, one of the most compelling witnesses I have ever seen, that was the testimony. And that's exactly why—and you're right on this, [counsel], and you did a good job pointing it out. That's exactly why he was not guilty as to the Nathal Williams [charges] ***

But there was—in the case of Jerome White, the man goes back to the back of the bus. There's no struggle over a gun, there's no evidence that there's a struggle over a gun, there's no accident. It's a fist fight and your client shoots him in the chest."

The trial court denied defendant's posttrial motion for a new trial and proceeded to sentencing.

¶ 15       The parties agreed that the minimum was 31 years and that defendant was required to serve 85 percent of his sentence.[2] The trial court then gave defendant the opportunity to make a statement, which defendant did. One of the issues on appeal is whether the trial court should have made further inquiry into assertions that defendant made at sentencing about his counsel, so we provide his statement in detail below.

"DEFENDANT: Your Honor, I feel through this trial I got an unfair trial. *** Due to certain issues I would like to bring to your attention. One was, every witness that got on the stand they said something different than what they said in the police station. They told me they did not say what they said in [sic] the police, and I feel that they truly changed their story to make their story sound way more believable.

---

[2]Eighty-five percent of 31 is 26.35. Defendant was 32 years old on the date of the offense and turned 37 the week following sentencing.

Second, it was the State before evidence—it got pictures of the party bus where I was knocked unconscious and the pictures are proved I was unconscious because there's a big puddle of my blood. And I know when they take DNA of each blood, they know who blood is whose. So this blood on the rear of the party bus on the back seat where I was proved that it was me. For me to be there that long, that lets you know I was there unconscious for a long period of time because when you see when I was in a hotel lobby it was just streaks of blood but that right there is a big puddle of my blood. And for there to be that much of my blood that would prove to you that I was knocked unconscious.

Another issue was, I wind up being locked up with Crissy Massey's fiancé, and he came and post to me the true story of what happened on the party bus. And I asked him, hey, how do you know that? He said Crissy, my fiancé. His name is Ronald Williams. So I'm like, she said all of that on the phone, and he said, yes. I brought it to my lawyer's attention. This was the first day of trial when I came back and he was on the phone when he told everything. He told her how they was on the party bus jumping on me. She also stated that on the recording one of the phones, that the State told her if she don't—if she don't testify, she could lose her job and her Section 8 [housing]. She also said she stated that she told the State she didn't—if they put her on the stand, she was going to regret it[. T]hat's why she didn't get on the stand the first day. And she's also going around she say she dislike when her family comes around because every time they comes around they start stuff. She also stated to him that the boy [defendant] was not doing nothing; my cousin was jumping on him for no reason. So, I told my attorney that I would like to bring issue to you even try to get the phone records; like I know

exact time it was and exact date and the phone record it would have proved he could have cross-examined her on it but he did nothing. So, I feel like that phone record— would have proved to you that I was innocent. Like, that phone record was everything, and it's like a lot of issues. It just like got back in, like all them issues that could help me be home with my family today, and I am truly innocent. I truly so sorry for what happened on the party bas. *I was wrong for having a gun on the party bus,* but my intention was not to hurt nobody, not to kill nobody but the gun went off when I was unconscious. (Emphasis added.)

THE COURT: Did you just say the gun went off when you were unconscious?

DEFENDANT: Yes.

THE COURT: Okay.

DEFENDANT: I was unconscious. And like I say, that picture will prove that I was unconscious for it to be that much of my blood, and [Staples]' statement, the guy I was with, he's the one who woke me up. Like I wanted to get on the stand, but I listened to my attorney; he told me don't do it. I'm like I want to tell my side of the story; I want to defend myself. And I figured all that would of helped me come home.

And on top of that when I was Grand Jury indicted, I was Grand Jury indicted on aggravated battery unlawful use of a weapon, great bodily harm; I was never charged with attempt murder.

THE COURT: You're wrong about that.

DEFENDANT: If you look it up, Google me right now and look it up, it's going to pop up aggravated battery unlawful use of a weapon.

9

THE COURT: Okay. I have the indictment in front of me. I actually asked for the front page but go ahead.

DEFENDANT: That's all the issue I want to bring to Your Honor. I truly am sorry for what happened to [White and Williams], like, I pray for them every day. I don't want nothing to happen to them. Like, I truly am sorry for their pain and like I'm sorry for bringing a gun on the party bus. I would've had a better outcome is my trial. That's all I have to say."

¶ 16 The trial judge responded that defendant's counsel was "one of the best lawyers" he had "ever known with regard to defending criminal cases." The court found defendant's statement that defendant was "unconscious and the gun went off" to be "ridiculous." The State then requested a conference with both defense counsel and the court, and they went off the record. Back on the record, the court stated that "[w]e broke because based on what the defendant said, there was a question whether we should move forward. Move forward we will." The court found: "You weren't unconscious. I've never heard anything so ridiculous to sit there and throw your lawyer under the bus." After stating that it would not hold these remarks against defendant, the trial court sentenced defendant to the minimum of 31 years.

¶ 17 On March 1, 2022, which was the same day as the sentencing, defendant filed a notice of appeal, and this timely appeal followed.

¶ 18                                    II. ANALYSIS

¶ 19                                    A. Conviction

¶ 20 Defendant's first claim regarding sufficiency of the evidence challenges his conviction by arguing that the State failed to prove that he had a specific intent to kill. Defendant argues that the record contains no evidence that defendant threatened to kill White and the record

shows that there were several bullets still remaining in the gun. In other words, if he had wanted to kill White, he could have fired more shots.

¶ 21 When a defendant challenges the sufficiency of the evidence at trial, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Aljohani*, 2022 IL 127037, ¶ 66. It is the factfinder's responsibility to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences. *Aljohani*, 2022 IL 127037, ¶ 66. This standard applies whether the evidence is direct or circumstantial, and circumstantial evidence is sufficient to sustain a conviction. *Aljohani*, 2022 IL 127037, ¶ 66.

¶ 22 When reviewing a sufficiency challenge, we will not retry the defendant or substitute our judgment for the trier of fact. *Aljohani*, 2022 IL 127037, ¶ 67. A conviction will be reversed only where the evidence is so unreasonable or improbable that it creates a reasonable doubt of the defendant's guilt. *Aljohani*, 2022 IL 127037, ¶ 67. "This standard of review applies regardless of whether the defendant received a bench or jury trial." *Aljohani*, 2022 IL 127037, ¶ 67.

¶ 23 To prove a defendant guilty of attempted murder, the State must prove (1) that defendant performed an act that constituted a substantial step toward committing a murder and (2) that he had the criminal intent to kill the victim. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 22. On this appeal, defendant contests only the second element, claiming that he had no intent to kill White.

¶ 24 In the case at bar, the trial court stated that it found White to be a particularly credible witness, and White testified that he had no gun. "It is the responsibility of the fact finder, not

11

the reviewing court, to determine the credibility of witnesses." *Teague*, 2013 IL App (1st) 110349, ¶ 26 (citing *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009)).

¶ 25　　The trial court found that this was a fist fight, until defendant pulled out a deadly weapon and fired at White. As this court has repeatedly held, the very fact of firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill. *Teague*, 2013 IL App (1st) 110349, ¶ 26 (see list of cases cited therein); *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 76; *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 77.

¶ 26　　Also, this court has repeatedly held that "frustrated marksmanship is not a defense to attempted murder." *Thompson*, 2020 IL App (1st) 171265, ¶ 75; *Teague*, 2013 IL App (1st) 110349, ¶ 27 (see cases cited therein). Rather, "it is a question of fact" for the factfinder "to determine whether defendant lacked the intent to kill or whether defendant was simply unskilled with his weapon." *Teague*, 2013 IL App (1st) 110349, ¶ 27. Similarly, misjudging how many shots to the chest are necessary to ensure death is not a defense to attempted murder.

¶ 27　　Since intent to kill is a state of mind, it is usually difficult to establish by direct evidence and, thus, it is usually inferred from the surrounding circumstances. *Teague*, 2013 IL App (1st) 110349, ¶ 24. Defendant's intent, as gleaned from the circumstances, was a question for the court as factfinder, since this case involved a bench trial. Circumstances that may establish intent include the character of the assault, the use of a deadly weapon, and the nature and extent of the victim's injuries. *Teague*, 2013 IL App (1st) 110349, ¶ 24. In the case at bar, defendant and White were involved in a fist fight, until defendant pulled out a deadly weapon and fired at White's chest, at almost point-blank range, causing a bullet to lodge just below White's heart. A person could have easily believed that one shot would kill White, given that White was slumped on the floor of the bus with a blood-soaked shirt and a gunshot wound to his chest

from a gun fired at close range. Reviewing these circumstances, we cannot conclude that the trial court's finding of an intent to kill was irrational. See *Aljohani*, 2022 IL 127037, ¶ 66 (the issue is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt). Thus defendant's sufficiency claim must fail.

¶ 28                                      B. Sentencing

¶ 29         Defendant argues that his trial counsel was ineffective for failing to argue for a sentence reduction pursuant to section 8-4(c)(1)(E) of the Code. 720 ILCS 5/8-4(c)(1)(E) (West 2016). Section 8-4, entitled "Attempt," sets forth the law regarding attempt offenses, including attempted murder. 720 ILCS 5/8-4 (West 2016). The particular subsection at issue on this appeal provides in full:

> "(E) if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, [1] he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, *and*, [2] had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony." (Emphasis added.) 720 ILCS 5/8-4(c)(1)(E) (West 2016).

In short, a defendant must show both (1) serious provocation and (2) negligence or accident.

¶ 30         In his closing argument, counsel discussed both (1) provocation and (2) accident. However, counsel said he was dropping provocation because it would be relevant only to self-defense and he was arguing accident instead of self-defense. Nonetheless, counsel stressed that

there was serious provocation. Although counsel discussed both factors during closing, he did not later move for a sentence reduction based on them.

¶ 31    To determine whether defendant was denied his right to effective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland*). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) that, absent these errors, there was a reasonable probability that the outcome of the proceeding would have been different. *Carlisle*, 2015 IL App (1st) 131144, ¶ 71.

¶ 32    Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness, as measured against prevailing professional norms. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. Under the second prong, the defendant must show that, " 'but for' " counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 33    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73. Thus, if one of the two prongs is missing, we need not consider the other one. Our analysis does not have to proceed in a particular order. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73.

¶ 34            First, we examine whether counsel erred by failing to seek the sentence reduction. To the extent that defendant's claim requires us to interpret the statute, we observe that the oft-quoted rules of statutory interpretation require us to look, first and foremost, to the plain language of the statute itself. *VC&M, Ltd. v. Andrews*, 2013 IL 114445, ¶ 30. With statutory interpretation, our primary goal is to ascertain and give effect to the intent of the statute's drafters. The most reliable indicator of their intent is the language they chose to use. *VC&M, Ltd.*, 2013 IL 114445, ¶ 30.

¶ 35            Both defendant and the State observe that prior first district appellate panels have interpreted the term "serious provocation" in the attempt statute (720 ILCS 5/8-4(c)(1)(E) (West 2016)) as having the same meaning as "serious provocation" in the second degree murder statute (720 ILCS 5/9-2 (West 2016)). Both cite *People v. Lauderdale*, 2012 IL App (1st) 100939, ¶ 23, in support of this observation. See *People v. Harris*, 2013 IL App (1st) 110309, ¶ 13. While we may find the logic and reasoning of an appellate court opinion persuasive, "the opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels." *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). An appellate court is "not bound" by an earlier appellate-court opinion and may "part company with that decision without offending the doctrine of *stare decisis*." *O'Casek*, 229 Ill. 2d at 440. Neither party cites a supreme court case on point, nor can we find one.

¶ 36            Subsection (E) became effective on January 1, 2010, and the *Lauderdale* case was decided two years later, in early 2012. The *Lauderdale* court stated that, since no opinions had yet interpreted this subsection, the court would turn for guidance to cases interpreting the term " 'serious provocation' " in the second degree murder statute. *Lauderdale*, 2012 IL App (1st)

100939, ¶ 23. As further support for looking to the second degree murder statute, the court noted that the language in subsection (E) was substantially similar to the language used in one of the grounds for second degree murder. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 23.

¶ 37     The *Lauderdale* court observed that, although the criminal code did not contain any categories or examples of serious provocation, the supreme court had recognized four distinct categories in connection with the second degree murder statute: (1) substantial physical injury to or assault of the defendant, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the defendant's spouse. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 24 (applying these four categories to the sentence reduction provision); *Harris*, 2013 IL App (1st) 110309, ¶ 13 (applying these four categories to the sentence reduction provision). But see *People v. Taylor*, 2016 IL App (1st) 141251, ¶¶ 5, 26 (with no mention of the four categories, the appellate court found that the defendant had acted out of a sudden and intense passion, after he witnessed the victim deliberately sideswipe the driver's side of a parked vehicle in which his daughter was a passenger); *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 88 (with no mention of the four categories, the appellate court found no provocation). Of the four categories, only mutual combat was discussed in *Lauderdale* because it was the only one at issue on the facts of that case. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 26. The court defined mutual combat as a fight where two people, upon a sudden quarrel and in hot blood, fight upon equal terms and death results. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 26. However, the court stated that there is no mutual combat if the manner in which the defendant retaliated was out of all proportion to the provocation. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 26.[3]

---

[3]Unlike *Lauderdale*, *Harris* did not discuss whether an out-of-proportion response disqualified an action as mutual combat under the sentence reduction provision, since there was no mutual combat or injury to the defendant in that case. *Harris*, 2013 IL App (1st) 110309, ¶ 14.

¶ 38    In *Lauderdale*, even though the defendant argued that the victim was much larger, the court found that his reaction was out of all proportion, where he pulled out a gun and pulled the trigger five times. *Lauderdale*, 2012 IL App (1st) 100939, ¶¶ 27-28. The gun failed to fire the first two times. The third and fourth times, the defendant fired at the victim's left leg and then at his right leg. The fifth time, he aimed at the victim's chest, but the victim turned and was shot in the shoulder, and the defendant fled. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 28. The court found that defendant's response was out of proportion and "[t]here was no mutual combat as the fight was not on equal terms," where the victim punched the defendant once and the defendant's response was to pull out a gun and fire multiple times. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 29.

¶ 39    On this appeal, we do not have to decide whether, as compared to the facts of *Lauderdale*, defendant's response was, or was not, out of proportion because defendant conceded that he would not have been found guilty of attempt had his response not been out of proportion. Defendant argues that "the whole point of the attempt murder conviction is that [defendant's] response was out of proportion. Had it not been out of proportion—if he had a legal justification—he likely would have been found not guilty of attempt[ed] murder." See, *e.g.*, *People v. Reagan*, 99 Ill. 2d 238, 240 (1983) ("The requirement of the attempt statute is not that there be an intent to kill, but that there be an intent to kill without lawful justification."). Defendant observes that, since every defendant eligible for this sentence reduction has already been found guilty of attempted murder, the issue at this stage is not the sufficiency of the evidence supporting the conviction, but rather whether there is evidence of serious provocation that would reduce the possible sentencing range.

¶ 40　　　　　Defendant thus presents us, as an initial matter, with a straightforward, purely legal question—namely, whether, as *Lauderdale* found, the statute bars eligibility to a defendant who engaged in mutual combat but responded out of proportion. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 34.

¶ 41　　　　　Without offense to *stare decisis* or our fellow jurists of the first district appellate court, we decline to follow *Lauderdale*. Certainly, the words of the attempt statute, quoted above, say nothing about mutual combat, much less a need for proportionality. Although there is similar language in both the second degree murder and the attempt statutes, they serve different functions. Before the application of the second degree murder statute, the defendant must first be found guilty of first degree murder. 720 ILCS 5/9-2(a) (West 2016). However, first degree murder does not necessarily require an intent to kill. 720 ILCS 5/9-1(a) (West 2016). A person may be found guilty if he or she has an intent to do great bodily harm or if he or she knows that his or her actions create a probability of great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2016). By contrast, the attempt statute specifically requires an intent to kill. Thus, before the sentence reduction provision at issue here can be applied, the defendant must have already been found, beyond a reasonable doubt, to have had an intent to kill. *Teague*, 2013 IL App (1st) 110349, ¶ 22; 720 ILCS 5/8-4(a) (West 2016). Hence, once a party is found guilty of attempt—and, thus, of having the specific intent to kill—disproportionality has essentially already been decided. Based thereon, we decline to find that disproportionality is an absolute bar to the sentence reduction set forth in the attempt statute.

¶ 42　　　　　An argument made by the State on appeal illustrates just how differently the sections function. The State argues, among other things, that it was the defense counsel's strategy to argue accident rather than provocation. In so arguing, the State raises an interesting question:

how is it possible for a defendant to prove accident, by a preponderance, after the State has already proven, beyond a reasonable doubt, that he had a specific intent to kill?

¶ 43    In order to be proven guilty of attempted murder, the State must prove that the defendant had a specific intent to kill. See 720 ILCS 5/8-4(a) (West 2016). In fact, in the case at bar, the defense counsel argued accident as a complete defense to the State's argument of specific intent, and the trial court acquitted him of the State's charges with respect to one of the victims. If accident is a complete defense to the specific intent required for the offense, and a finding of "no accident" results in a guilty finding, then there would be no circumstance where a sentence reduction based on accident could ever take effect.

¶ 44    The State also argues a lack of prejudice, in that the argument for a sentence reduction would have failed, since accident and provocation are inapposite and his counsel chose to argue the former. We find that argument unpersuasive because, as we noted above, rather than treating them as inapposite, the statute requires both.

¶ 45    As noted above, the provision at issue requires defendant to prove by a preponderance that, "had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death." 720 ILCS 5/8-4(c)(1)(E) (West 2016). The only way that we can interpret the words of this provision to make sense, in light of an already proven intent to kill, is to find that, although the defendant intended to kill the victim, his acts were sufficiently at the minimum, such that if the victim had actually died, the death could still be considered negligently or accidentally caused. In the case at bar, where defendant fired one shot at the victim during the midst of a physical fight, we find that the trial court, acting as factfinder at sentencing, may have found this part of the provision satisfied. We cannot say definitively because defendant in the case at bar never even tried to satisfy his preponderance

19

burden, since his counsel never raised the issue. However, as much as it is possible to say, with no attempt yet having been made to satisfy the burden, we find that defendant has shown a reasonable possibility of success with respect to the accident or negligence requirement.

¶ 46        We are not the first court to struggle with the accident or negligence requirement. In *Taylor*, 2016 IL App (1st) 141251, ¶ 23, the appellate court found that a specific intent to kill is "fundamentally incompatible with the statutory language providing that if the defendant's victim died, the death would have been deemed negligent or accidental." The *Taylor* court solved the problem by reading the word "and" in the provision as an "or" (720 ILCS 5/8-4(c)(1)(E) (West 2016)). *Taylor*, 2016 IL App (1st) 141251, ¶ 22 ("the statutory language clearly addresses two separate scenarios"). The *Taylor* court postulated that the provision contained two different and separate scenarios and that the accident or negligence requirement must be assumed to be addressing "the 'transferred intent' scenario," where one accidentally kills someone other than the intended victim. *Taylor*, 2016 IL App (1st) 141251, ¶ 22. We do not find this interpretation persuasive, because we presume that legislators know the difference between "or" and "and."

¶ 47        As for the serious provocation requirement, we note that White, the victim in this case, ran from the front of the bus to the back of it, for the express purpose of assaulting defendant and engaging in mutual combat with him. We find compelling defendant's argument that, if defendants whose reactions were out of proportion were barred from this section, then no defendant would be eligible for the reduction because the State would have already proven beyond a reasonable doubt that they had a specific intent to kill, without any legal justification. Thus, since this language requiring proportionality cannot be found in the plain language of the statute, we decline to apply it. Based on White's decision to run to the back of the bus in

20

order to assault defendant and engage in mutual combat, we find that there was a reasonable probability that the trial court could have found, depending on the preponderance of evidence presented by counsel, that defendant "was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill." 720 ILCS 5/8-4(c)(1)(E) (West 2016). Accordingly, counsel's failure to ask the court to consider a sentence reduction under the attempt statute resulted in prejudice to defendant.

¶ 48      Having found the prejudice prong of *Strickland*, we turn to the performance prong. Given that counsel had already argued both provocation and accident at trial, we find that counsel's performance at sentencing fell below an objective standard of reasonableness by not seeking the sentence reduction. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. Defendant had nothing to lose at this point by arguing for the reduction and could only gain. He had already been found guilty beyond a reasonable doubt of the offense, and the offense mandated a Class X sentence. There was simply no downside to seeking a sentence reduction. For these reasons, we vacate defendant's sentence and remand for resentencing.

¶ 49      To recap, there have been four opinions citing subsection (E): two cited the four categories, two did not. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 24 (citing the four categories); *Harris*, 2013 IL App (1st) 110309, ¶ 13 (citing the four categories). But see *Taylor*, 2016 IL App (1st) 141251, ¶ 26 (no mention of the four categories); *Guyton*, 2014 IL App (1st) 110450, ¶ 88 (no mention of the four categories). We take no position on whether provocation for subsection (E) is limited to these four categories. We do not have to decide this question in order to resolve the case before us because two of the categories are present here—namely, mutual combat and substantial physical assault. As discussed, we find that an "out of proportion" response is not an absolute bar to application of this section because it is

21

inconsistent where a specific intent to kill and a lack of legal justification have already been proven beyond a reasonable doubt. Only one of the four opinions found that an out-of-proportion response disqualified a defendant from the sentence reduction provision, and that was *Lauderdale*. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 34. For the reasons already discussed, we did not find this part of *Lauderdale* persuasive. Of the four opinions, only one mentioned the issue of whether the firearm enhancement applies to subsection (E). The *Lauderdale* court noted the issue without deciding it, and we do the same. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 35. In the case below, that question failed to become an issue when counsel failed to invoke the section at all. We take no position on that question unless and until it becomes ripe for our decision.

¶ 50    Since we are remanding for resentencing, there is also no need for us to address defendant's *Krankel* claims at this time. If defendant chooses to reassert his allegations at resentencing, we presume that the court will take whatever actions are required on the record. In the sentencing transcript before us, it appears as though any relevant discussions about defendant's remarks regarding ineffective counsel occurred off the record and, hence, were hidden from us.

¶ 51                                III. CONCLUSION

¶ 52    Due to counsel's ineffectiveness in not seeking a sentence reduction, we vacate the sentence and remand for resentencing. Defendant has demonstrated that counsel's failure to advocate for the reduction was not reasonable, where there was no downside to asking, the court was adhering to the minimum, and defendant has demonstrated a reasonable probability that the outcome of the sentencing may have been different, given that White ran to the back of the bus in order to assault defendant and engage in mutual combat.

22

¶ 53          Sentence vacated; cause remanded.

¶ 54          JUSTICE TAILOR, concurring in part and dissenting in part:

¶ 55          I concur in the majority's decision to affirm Haynes' conviction for attempted murder, but dissent from its decision to vacate his sentence and remand for a new sentencing hearing. Haynes raises a simple issue relating to his sentence: Was counsel ineffective for failing to argue that Haynes should have received a Class 1 sentence under section 8-4(c)(1)(E), based upon the fact that he acted under a sudden and intense passion resulting from serious provocation? The majority, however, analyzes whether section 8-4(c)(1)(E) "bars eligibility to a defendant who engaged in mutual combat but responded out of proportion." The resolution of Hayne's ineffective assistance of counsel claim is much less complicated.

¶ 56          Section 8-4(c)(1)(E) states in pertinent part:

              "(E) if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, [1] he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, *and*, [2] had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony." (Emphasis added.) 720 ILCS 5/8-4(c)(1)(E) (West 2016).

¶ 57          In finding that Haynes established the necessary prejudice under *Strickland*, the majority concludes:

              "Based on White's decision to run to the back of the bus in order to assault [Haynes] and engage in mutual combat, we find that there was a reasonable probability that the trial court could have found, depending on the preponderance of evidence presented by

23

counsel, that [Haynes] 'was acting under a sudden and intense passion resulting from serious provocation by the individual whom [Haynes] endeavored to kill.' 720 ILCS 5/8-4(c)(1)(E) (West 2016). Accordingly, counsel's failure to ask the court to consider a sentence reduction under the attempt statute resulted in prejudice to [Haynes]." *Supra* ¶ 47.

¶ 58    As difficult as it is to make sense of section 8-4(c)(1)(E), it is clear that for Haynes to be sentenced as a Class 1 offender under section 8-4(c)(1)(E), he would have to show by preponderance of the evidence that he was acting under a sudden and intense passion, resulting from serious provocation, *and* that had White died, his death would have been negligent or accidental. 720 ILCS 5/8-4(c)(1)(E) (West 2016). Our supreme court long ago observed that, "[t]he conjunction 'and' " signifies and expresses the relation of addition." *City of La Salle v. Kostka*, 190 Ill. 130, 137 (1901). " ' "As a general rule, the use of the conjunctive, as in the word '*and*,' indicates that the legislature intended for *all* of the listed requirements to be met. [Citations.]" ' " (Emphasis in original and added.) *People v. A Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 500-01 (2005) (quoting *Byung Moo Soh v. Target Marketing Systems, Inc.*, 353 Ill. App. 3d 126, 131 (2004), quoting *Gilchrist v. Human Rights Comm'n*, 312 Ill. App. 3d 597, 602 (2000)).

¶ 59    Although Haynes now argues that he was acting as a result of serious provocation when he shot White under the first prong, Haynes has failed to offer any argument on appeal as to negligence or accident as required by the second prong of section 8-4(c)(1)(E)—that is, had White died, his death would have been negligent or accidental. The majority has ignored Haynes's failure in this respect, finding "that [Haynes] has shown a reasonable possibility of success with respect to the accident or negligence requirement" because the "trial court, acting

24

as factfinder at sentencing, may have found this part of the provision satisfied" where "[Haynes] fired one shot at the victim during the midst of a physical fight." *Supra* ¶ 45. My search found that Haynes did not mention the word accident, negligence, or any variation of either word even once as part of his ineffective assistance argument on appeal. Accordingly, I would find that Haynes has failed to establish the prejudice necessary for an ineffective assistance of counsel finding. *People v. Graham*, 206 Ill. 2d 465, 476 (2003) ("[I]f an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient.").

¶ 60        In addition to my finding with regard to prejudice, I also take issue with the majority's finding that defense counsel's performance was unreasonable under the first prong of *Strickland*. Despite previously acknowledging that defense counsel made a strategic decision not to pursue provocation "because it would be relevant only to self-defense and he was arguing accident instead of self-defense," the majority nonetheless finds that counsel should have argued for Class 1 sentencing "[g]iven that counsel had already argued both provocation and accident at trial." *Supra* ¶¶ 30, 48. Contrary to the majority's finding, defense counsel did not argue provocation. With respect to provocation and self-defense, defense counsel stated he was not arguing self-defense because

> "the theory of self-defense is you do it, you take this action not accidently, not negligently, not recklessly, you take these actions purposefully. There's a purpose in your mind. The purpose is to defend yourself against imminent death or great bodily harm. You're defending yourself against imminent death or great bodily harm. And though [Haynes] may have thought that at that moment by [White] charging at him,

[Haynes] doesn't at that point, at any point -- no witness ever testifies that [Haynes] aims, points, raises in any way, shape, or form that gun in the direction of anybody."

Later, defense counsel stated with respect to self-defense:

"[I]t wouldn't have worked here, Judge. If I asserted that Victor Haynes did this for a purp -- Self-defense you do for a purpose. You do it because you want to shoot that person because at the time you have an imminent fear of death or great bodily harm at that moment, and therefore, you're doing it for a reason. Self-defense is never an accident.

Okay. And in this case, Judge, the reason that we didn't go forward with self-defense is because this was an accident. Victor Haynes had no -- had no intention, had no reason, had no purpose at that point to shoot any of these people. This was during a struggle, this was during a tussle."

¶ 61　　　　Defense counsel clearly made a strategic decision not to pursue self-defense based on provocation. It would be illogical for defense counsel to argue that Haynes should be sentenced as a Class 1 offender because he was provoked, when this theory was clearly abandoned at trial. Furthermore, at the hearing on Haynes's motion for a new trial, the court specifically stated, "With regard to Jerome White, this was not an accident. Now, I based my finding on the totality of the circumstances; certainly location of the wound, gravity of the wound, all of those factors I considered. With regard to Jerome White, this wasn't an accident." As the trial court had already determined that Haynes's actions with respect to White were not accidental, it would be equally illogical for defense counsel to argue that Haynes should be sentenced as a Class 1 offender because had Haynes killed White, his death would be negligent or

26

accidental. I therefore disagree with the majority's finding that defense counsel's failure to pursue Class 1 sentencing was unreasonable.

¶ 62        As an aside, I find it important to note that, at sentencing, Haynes acknowledged that he should not have brought a gun on the party bus but claimed that he was unconscious when the gun when off. Seeking clarification, the court asked. "Did you just say the gun went off when you were unconscious?" Haynes replied, "Yes." Haynes then explained, "I was unconscious. And like I say, that picture will prove that I was unconscious for it to be that much of my blood, and James' statement, the guy I was with, he's the one who woke me up."

¶ 63        If Haynes was truly unconscious at the time the gun went off, as he claimed, he was not "acting" at all, let alone acting as a result of serious provocation. According to him, he was lying on the floor of the bus in a pool of blood. It would therefore be impossible for him to prove by preponderance of the evidence that he committed the attempted murder while acting under the sudden and intense passion, resulting from serious provocation, necessary for him to be sentenced as a Class 1 offender. Accordingly, Haynes could not establish prejudice under *Strickland* for counsel's failure to request a Class 1 sentence for attempt murder.

¶ 64        I concur in the majority's decision to affirm Haynes' conviction for attempted murder, but respectfully dissent in its decision to vacate his sentence and remand for a new sentencing hearing.

*People v. Haynes*, 2023 IL App (1st) 220296

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-00867; the Hon. Michael J. Hood, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Sarah Curry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian A. Levitsky, and Sharon Kim, Assistant State's Attorneys, of counsel), for the People. |